# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

| | |
|---|---|
| WIMBLEDON FINANCING MASTER FUND, LTD., | Index No.: |
| | Date purchased: |
| Plaintiff, | |
| | **SUMMONS** |
| - against - | |
| | Plaintiff designates New York |
| BIENERT MILLER & KATZMAN, PLC, and STEVEN J. KATZMAN, | County as the place of trial |
| | The basis for venue is CPLR § |
| Defendants. | 503(a) |

-----------------------------------------------------------------x

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: August 30, 2018

KAPLAN RICE LLP

By: /s/ Joseph A. Matteo
    Howard J. Kaplan
    Michelle A. Rice
    Joseph A. Matteo

142 West 57th Street
Suite 4A
New York, New York 10019
(212) 235-0300 (telephone)
(212) 235-0301 (facsimile)

*Attorneys for Plaintiff Wimbledon Financing Master Fund, Ltd. (In Official Liquidation), as Assignee of Weston Capital Partners Master Fund II, Ltd.*

**Defendants' Addresses**:

Bienert Miller & Katzman, PLC
903 Calle Amanecer Suite #350
San Clemente, CA 92673

Steven J. Katzman
903 Calle Amanecer Suite #350
San Clemente, CA 92673

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
WIMBLEDON FINANCING MASTER FUND, LTD.,                           : Index No. _____
                                                                 :
                       Plaintiff,                                :
                                                                 :
       - against -                                               : **COMPLAINT**
                                                                 :
BIENERT MILLER & KATZMAN, PLC, and STEVEN J.                     :
KATZMAN,                                                         :
                                                                 :
                       Defendants.                               :
                                                                 :
-----------------------------------------------------------------x

Plaintiff Wimbledon Financing Master Fund Ltd. (In Official Liquidation) ("Wimbledon" or "Plaintiff"), as an assignee of Weston Capital Partners Master Fund II, Ltd. ("Partners II"), by and through its Joint Official Liquidators and its counsel, Kaplan Rice LLP, alleges as follows against defendants Bienert Miller & Katzman, PLC ("BMK") and Steven J. Katzman ("Katzman" and, together with BMK, "Defendants").

## PRELIMINARY STATEMENT

1.     By this action, Wimbledon seeks money damages against Katzman and BMK for aiding and abetting their clients' efforts to evade enforcement of a judgment by transferring millions of dollars in violation of restraining notices that Wimbledon had served on those clients. Katzman and BMK received and reviewed copies of those restraining notices on the day they were served, yet nonetheless helped their clients (one of whom has now been convicted of defrauding Wimbledon) transfer $7.412 million in contravention of those notices' clear proscriptions. Katzman and BMK did so first by transferring $2.412 million that it held in its own escrow account as a partial settlement payment to a third party. Katzman and BMK then continued to aid and abet their clients' violations of the restraining notices by stonewalling

Wimbledon's discovery efforts, which permitted Katzman's and BMK's clients to make a second, $5 million settlement payment to that same third party.

2.  This Court already has held Katzman and BMK in civil contempt for effectuating the $2.412 million transfer, noting that "[t]here is simply no ambiguity here. No reasonable attorney should expect that helping a client violate a restraining notice is acceptable. Nor is it acceptable for that attorney to ask another court to unfreeze assets to effectuate a transfer when, unbeknownst to that other court, such a transfer would be violative of a restraining notice." The Court concluded that Katzman (and therefore his law firm) had "made a deliberate decision to disregard the Restraining Notices, and now must account for his willful neglect." The Court ordered Katzman to attach a copy of the Court's decision to any motions for admission *pro hac vice* in New York within the following five years.

3.  Contempt sanctions are not the sole remedy available for violations of a restraining notice. Independent of sanctions for contempt, a third party also may be held liable in tort to a judgment creditor for violations of a restraining notice. Here, the Court's prior findings and Katzman's own admissions establish, at a minimum, that Katzman and BMK acted negligently in facilitating the transfer of $2.412 million in violation of the restraining notices. Moreover, Katzman's and BMK's efforts to facilitate their clients' subsequent, $5 million payment in violation of the restraining notices was also negligent, at the very least. As such, Katzman and BMK are liable to Wimbledon for the full amount of the transfers they aided and abetted, as well as pre- and post-judgment interest.

**PARTIES**

4.  Plaintiff Wimbledon is an exempted company organized under the laws of the Cayman Islands. On July 17, 2014, the Grand Court of the Cayman Islands, Financial Services

Division, appointed Chris Johnson and Russell Homer as Joint Official Liquidators to conduct a court-supervised liquidation of Wimbledon.

5. Defendant Bienert Miller & Katzman, PLC is a California professional legal corporation located in San Clemente, California.

6. Defendant Steven J. Katzman is a partner of BMK.

7. Non-party David Bergstein is an individual who resided in Hidden Hills, California, and is currently incarcerated in the State of New York. Bergstein created Arius Libra, was its sole initial director, and served as chairman of the board of directors and vice president of Arius Libra at all times relevant hereto. Bergstein owns and controls Graybox, LLC, which was one of the recipients of the Partners II "loan" proceeds that Bergstein subsequently used for his personal benefit. After a four-week trial before Judge Castel in the United States District Court for the Southern District of New York, a jury convicted Bergstein of seven counts of securities fraud, investment advisor fraud, wire fraud and conspiracy to commit those substantive offenses in connection with his role in defrauding Wimbledon and Partners II, including with respect to the Partners II "loan" and the fraudulent transfer of those "loan" proceeds.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over BMK and Katzman pursuant to CPLR 301 and/or 302(a) because Katzman, in his capacity as a partner of BMK, appeared in this Court *pro hac vice* to represent Bergstein in the special proceeding *Wimbledon Financing Master Fund, Ltd. v. Bergstein, et al.*, Index No. 150584/2016 (the "Turnover Proceeding"). In his affidavit in support of his motion for admission *pro hac vice*, Katzman "agree[d] to be subject to the jurisdiction of the Courts of the State of New York with respect to any acts occurring during the

course of [his] participation in this matter." Katzman remains admitted *pro hac vice* in the Turnover Proceeding. Furthermore, the Court (Kornreich, J.) has observed that Katzman "is clearly within the jurisdiction" of this Court because he has appeared on Bergstein's behalf in his pending criminal case in the United States District Court for the Southern District of New York.

9. Venue is proper in this Court pursuant to CPLR 503(a) because Wimbledon designates this County as the place of trial.

## FACTUAL ALLEGATIONS

### A. Wimbledon Obtains a Judgment Against Bergstein and Graybox

10. On January 22, 2016, Wimbledon commenced a special proceeding against David Bergstein and Graybox LLC, among others. The purpose of this special proceeding was to enforce a judgment that Partners II had previously obtained against Arius Libra Inc. ("Arius Libra") and assigned to Wimbledon. In its petition, Wimbledon alleged that Bergstein, who had founded Arius Libra and served as both a director and officer of the company, had forced Arius Libra to take a "loan" from Partners II and then fraudulently conveyed a substantial portion of the proceeds of that "loan" to himself through various entities and individuals that he controlled, including Graybox. Wimbledon accordingly sought an order requiring Bergstein and the other recipients of the "loan" proceeds to turn over amounts equal to the fraudulent conveyances they received in partial satisfaction of Partners II's judgment against Arius Libra.

11. On July 17, 2017, the Supreme Court of the State of New York, New York County issued a decision and order granting Wimbledon summary disposition against all respondents, holding that each of the transfers identified in Wimbledon's petition was both constructively and intentionally fraudulent and that "[e]ach of the respondents is liable for the

amount of their respective conveyances." *Wimbledon Financing Master Fund, Ltd. v. Bergstein, et al.*, No. 150584/2016, 2017 WL 3024254, at *7 (Sup. Ct. N.Y. Cnty. Jul. 17, 2017).

12. The Court further held that Bergstein was jointly and severally liable for the full amount of all of Arius Libra's conveyances because he was the alter ego of Arius Libra, finding that "[t]here is no question that Arius Libra was used by Bergstein as 'a sham entity designed to defraud investors [e.g., Wimbledon] and creditors [e.g., Partners II].'" *Id.* at *8. The Court also awarded Wimbledon statutory prejudgment interest at the rate of 9 percent as well as its reasonable attorneys' fees pursuant to DCL § 276-a. *Id.* at *11.

### B. Wimbledon Serves Restraining Notices on Bergstein and Graybox, Which BMK Receives the Same Day

13. On July 21, 2017, the Clerk of New York County entered judgment against Bergstein for $8,494,578.75 and against Graybox for $765,068.49. Later that same day, Wimbledon served restraining notices on Bergstein and Graybox via certified mail pursuant to CPLR 5222 (the "Restraining Notices"). Each Restraining Notice was labelled "**RESTRAINING NOTICE**" and stated that Bergstein and Graybox were "hereby forbidden to make or suffer any sale, assignment, transfer, or interference with any property in which You have an interest, except upon direction of the sheriff or pursuant to an order of the court, until the Judgment is satisfied or vacated."

14. Wimbledon also sent copies of the Restraining Notices via email to Bergstein's and Graybox's then-counsel at Sills Cummis & Gross P.C. ("SCG"), which an attorney at SGC immediately forwarded to Katzman and Anthony Bisconti of BMK. Katzman has conceded that he became aware of the Restraining Notices on July 21, 2017, when SCG forwarded these documents to him. Katzman has further admitted that he "glanced" at the notices when he received them, but claims that he did not "review or analyze them in depth." Subsequent

5

discovery has revealed, however, that Katzman discussed the Restraining Notices with his co-counsel at SGC on numerous occasions.

### C. Katzman and BMK Facilitate the Transfer of $2.412 Million in Violation of the Restraining Notices

15.     On August 10, 2017, Katzman and Bergstein participated in a mediation in New York, New York with representatives of The Wimbledon Fund, SPC (Class TT) ("Class TT") to discuss the potential settlement of Class TT's claims against Bergstein and Graybox, among others, in connection with an action captioned *The Wimbledon Fund, SPC (Class TT) v. Graybox, LLC, et al.*, in the United States District Court of the Central District of California (the "California Action"). Like Wimbledon, Class TT had asserted claims against Bergstein and Graybox for misappropriating its assets. Unlike Wimbledon, Class TT did not have a judgment against either Bergstein or Graybox, although Class TT previously had obtained a preliminary injunction preventing the disbursal of $2.412 million that Bergstein had received in connection with a settlement in another case and then directed to Graybox. BMK held those funds in escrow subject to the California court's preliminary injunction order.

16.     Katzman has stated that this mediation resulted in a settlement term sheet, which memorialized the parties' agreement "to enter into a settlement agreement to resolve all claims and issues" among Class TT, Bergstein, Graybox and Swartz IP ("SIP"), another entity that Bergstein controlled. The term sheet contemplated a total settlement payment to Class TT in the amount of $9.4 million, payable in three installments: first, payment of the "over $2.4 million" that BMK held pursuant to the preliminary injunction in the California Action; second, an additional $5 million within thirty days of execution of the parties' written settlement agreement; and third, $2 million within twelve months of the execution of the parties' written settlement agreement.

17. At the time of the New York mediation, the California Action had been stayed pending Bergstein's criminal trial. On August 16, 2017—less than a month after Katzman received the Restraining Notices—BMK filed a joint stipulation on behalf of Bergstein and Graybox (as well as Class TT) to lift the stay and to modify the preliminary injunction order to permit BMK to distribute the $2.412 million in BMK's trust account to Class TT as consideration for Class TT's release of its claims against Bergstein and Graybox. BMK did not seek permission from this Court to release these funds, did not inform the California court that Bergstein and Graybox were subject to the Restraining Notices, and did not inform Wimbledon of its application.

18. On August 17, 2017, the California court so-ordered the joint stipulation lifting the injunction and authorized the distribution of the $2.412 million to Class TT. BMK thereafter transferred the funds in its trust account to Class TT (through Class TT's counsel) pursuant to the stipulation.

### D. Katzman and BMK Facilitate the Transfer of an Additional $5 Million in Violation of the Restraining Notices

19. Even though BMK transferred the $2.412 million in August 2017, Bergstein, Graybox, SIP and Class TT did not finalize their settlement agreement with Class TT until November 21, 2017 (the "Settlement Agreement"). The Settlement Agreement provides that "Bergstein, SIP and/or Graybox" shall pay Class TT a total of $9.412 million in three separate payments: (1) the $2,412,000 that BMK previously transferred in August 2017, (2) an additional $5 million to be paid by SIP or its designee within 30 days of execution of the Settlement Agreement—*i.e.* by December 21, 2017 and (3) a final $2 million to be paid by SIP or its designee within 12 months of the execution of the Settlement Agreement, which is secured by a judgment against Bergstein. *See id.* ¶ A.1(a)-(c). Class TT agreed to release all claims against

7

Bergstein, Graybox, SIP and others upon receipt of the first two payments. *See id.* ¶ B.1.[1] Katzman approved the Settlement Agreement as to form. *See id.* at p. 15.

20. Wimbledon did not become aware that Bergstein and Graybox had settled with Class TT or transferred the $2.412 million until early December 2017. Upon learning of that transfer, Wimbledon promptly brought the violation of the Restraining Notices to the Court's attention on December 5, 2017, during a hearing on SCG's motion to withdraw as Bergstein's and Graybox's counsel. Wimbledon informed the Court that it had not yet had the opportunity to conduct its own investigation of the matter, but advised the Court that it would do so in short order. As to Katzman specifically, the Court noted that Wimbledon should "move for contempt, criminal contempt, civil contempt, whatever you want, if he's ignored any one of my orders intentionally." The Court also refused to permit Katzman to withdraw his *pro hac vice* admission so that it could retain jurisdiction over him, finding that "I have jurisdiction over him because of the pro hac vice. That's why I am not relieving him."

21. On the evening of December 5, 2017, Wimbledon's counsel spoke to Katzman directly, informing him that Wimbledon believed that the $2.412 million transfer was a violation of the Restraining Notices. On December 8, 2017, Wimbledon sent Katzman a letter informing him that the $2.412 million transfer violated the Restraining Notices and asking Katzman to provide (i) BMK's communications with others concerning the Judgment and Restraining Notices, (ii) the Settlement Agreement, and (iii) an explanation of the circumstances surrounding the distribution of the Frozen Funds to Class TT.

---

[1] Bergstein also agreed to finance Class TT's litigation against Partners II and Wimbledon, and to cooperate with Class TT's counsel in the prosecution of those claims, in exchange for 50 percent of the proceeds of any recovery that Class TT obtains from Partners II or Wimbledon up to the first $4.8 million collected. *See id.* ¶ A.1(d). *See also id.* ¶¶ A.1(e) & A.2-3. As such, Bergstein effectively financed third-party lawsuits against Wimbledon with money that should have been used to satisfy Bergstein's judgment debt to Wimbledon.

22. Katzman refused to provide any of this information. Instead, by letter dated December 14, 2017, he argued that Class TT had a superior interest in the Frozen Funds even though Class TT—unlike Wimbledon—did not have a judgment against either Bergstein or Graybox. According to Katzman, the Restraining Notices therefore "had no impact" on the distribution of the Frozen Funds to Class TT. Katzman did not explain why he and his clients did not submit the question of priority to this Court (or to the court in the California Action). Katzman also did not contest that he and BMK were aware of the Restraining Notices at the time that they distributed the Frozen Funds to Class TT. Rather, he argued merely that those notices had not been served on his firm directly. Katzman further claimed, without any explanation, that all of the information that Wimbledon sought, including the Settlement Agreement, was protected by privilege.

23. At that time, Katzman knew that the $5 million settlement payment was due by no later than December 21, 2017. Katzman also knew that Wimbledon contended that the prior transfer of $2.412 million was in violation of the Restraining Notices. Yet Katzman did not inform Wimbledon that the second, $5 million payment was imminent. By refusing to inform Wimbledon of this payment, and by refusing to provide Wimbledon with a copy of the settlement agreement, Katzman prevented Wimbledon from taking steps to prevent Bergstein from causing this payment to occur, which he did on December 19, 2017.

### E. The Court Holds Bergstein, Graybox, Katzman and BMK in Contempt of the Restraining Notices

24. On February 5, 2018, Wimbledon moved for an order of civil contempt against Bergstein, Graybox, Katzman and BMK. During oral argument on April 4, 2018, Katzman and BMK did not contest that they were aware of the Restraining Notices when they transferred the $2.412 million to Class TT, but argued that contempt sanctions were not warranted because it

was "ambiguous" whether the Restraining Notices applied to the $2.412 million that BMK had held pursuant to the preliminary injunction order, and therefore their actions could not be considered "willful" violations of those notices. Katzman and BMK did not disclose to the Court that the additional, $5 million payment had also occurred.

25. The Court did not issue a decision at the hearing, but rather ordered Katzman and BMK to produce the settlement agreement among Bergstein, Graybox and Class TT, noting "I think it's important to see the settlement agreement."

26. It was not until Katzman and BMK produced that agreement that Wimbledon became aware of the second settlement payment. Upon reviewing the settlement agreement, the Court ordered Katzman to submit an affirmation "indicating if, when and how Mr. Katzman and/or BMK were notified and/or provided with the restraining notices that were served on Bergstein [and] Graybox" and to produce a copy of the term sheet referenced in the settlement agreement. Katzman and BMK thereafter moved for a stay of this Court's order in the First Department, which that court denied. Katzman finally submitted his affidavit and produced a copy of the term sheet on May 1, 2018.

27. By decision and order dated and entered on May 10, 2018, the Court held Bergstein, Graybox, Katzman and BMK in civil contempt of the Restraining Notices. The Court found that "[t]here is no question of fact that [Bergstein and Graybox] knowingly and willfully violated the Restraining Notices." The Court further found that it is was "of no moment" that Bergstein and Graybox had sought permission from the California court to distribute the funds, finding that Bergstein and Graybox "defrauded the California court by seeking permission to make the transfers without disclosing that the subject funds were encumbered by the Restraining

Notices." *Id.* at 5. The Court concluded that Bergstein's actions were "very much in keeping with the deceptive manner in which Bergstein handles his money."

28. The Court likewise found Katzman and BMK in contempt for aiding and abetting Bergstein's and Graybox's violations of the Bergstein Restraining Notices, observing that "[t]here is simply no ambiguity here. No reasonable attorney should expect that helping a client violate a restraining notice is acceptable. Nor is it acceptable for that attorney to ask another court to unfreeze assets to effectuate a transfer when, unbeknownst to that other court, such a transfer would be violative of a restraining notice." The Court also rejected Katzman's claimed ignorance of the significance of the Restraining Notices, holding that Katzman had willfully ignored the Restraining Notices:

> [A]fter having been sent the Restraining Notices by his co-counsel, SCG, it was incumbent upon him to read and understand them and, if he was unfamiliar with their implications as a California attorney, he should have sought guidance from SCG. The very purpose of having to associate with a New York attorney is to ensure the *pro hac vice* admitted counsel is fully aware of applicable New York law. SCG clearly felt it necessary to inform Katzman of the Restraining Notices (perhaps given Katzman's involvement in negotiating a settlement of the California Action). Katzman, however, admits that he ignored them based on his assumption that they simply did not affect anything going on in California (including, as discussed herein, based on his erroneous understanding of California lien law). In other words, he knew of the Restraining Notices because SCG determined they were important enough to be sent to him, but rather than understand why he received them or how they affected his client, he decided to not think about it.

The Court concluded that "Katzman made a deliberate decision to disregard the Restraining Notices, and now must account for his willful neglect."

29. While the Court held Katzman and BMK in contempt, it declined to hold them liable for the full amount of $2.412 million. The Court noted that "given the forfeiture and restitution in the criminal action (in addition to Wimbledon's other enforcement efforts),

11

Wimbledon hopefully will be made whole." To date, however, Bergstein still has not satisfied the Judgment against him, either in whole or in part. Moreover, Bergstein (represented by BMK) continues to argue in his criminal action that he is not required to make any restitution to Wimbledon.

## CAUSES OF ACTION

### First Cause of Action
### (Negligence – $2.412 Million Transfer)

30. Wimbledon repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

31. Katzman and BMK represented Bergstein and Graybox in the Turnover Proceeding as well as the California Action.

32. Wimbledon obtained judgments against Bergstein and Graybox in the Turnover Proceeding, and then served the Restraining Notices on Bergstein and Graybox on July 21, 2017.

33. The Restraining Notices forbid Bergstein and Graybox from selling, assigning, transferring or otherwise interfering with any property in which they had an interest without prior permission of the sheriff of New York County or this Court.

34. Katzman and BMK received the Restraining Notices on July 21, 2017, when their co-counsel at SCG forwarded those documents to Katzman via email.

35. Katzman has admitted that he reviewed the Restraining Notices at the time, and SGC has affirmed that it discussed the Restraining Notices with Katzman on a number of occasions.

36. Katzman and BMK had a duty not to violate the Restraining Notices or to assist their clients in violating the Restraining Notices. Yet notwithstanding the plain terms of the Restraining Notices, Katzman and BMK transferred $2.412 million that it held in its escrow

12

account to Class TT. As this Court already has found, this transfer violated the Restraining Notices.

37. Katzman and BMK did not seek permission from this Court or from the sheriff of New York County to transfer this money to Class TT. Furthermore, while Katzman and BMK did seek and obtain permission to make this transfer from the United States District Court for the Central District of California (which had enjoined the transfer of the funds pending the resolution of Class TT's claims against Graybox, among others), they did not inform the California court of the Restraining Notices. Nor did Katzman or BMK inform Wimbledon of its motion or the subsequent transfer to Class TT.

38. Katzman's and BMK's actions were, at a minimum, negligent. Indeed, this Court already has found that Katzman willfully neglected the Restraining Notices by facilitating the transfer of $2.412 million to Class TT.

39. As a direct and proximate result of Katzman's and BMK's negligence, Wimbledon has suffered damages in an amount to be determined at trial, but not less than $2.412 million, plus pre- and post-judgment interest.

### Second Cause of Action
### (Negligence -- $5 Million Transfer)

40. Wimbledon repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

41. The Settlement Agreement among Bergstein, Graybox, SIP and Class TT provided for a $5 million settlement payment within thirty days of the execution of the agreement.

42. Bergstein executed the Settlement Agreement on behalf of himself, Graybox and SIP on November 21, 2017. Katzman and BMK negotiated the Settlement Agreement on behalf

of Bergstein, Graybox and SIP, and Katzman approved the Settlement Agreement as to form. Katzman and BMK therefore knew that the $5 million settlement payment was due on or before December 21, 2017.

43. Wimbledon informed Katzman by telephone on December 5, 2017 and by letter on December 8, 2018 that the prior transfer of $2.412 million to Class TT violated the Restraining Notices. Katzman and BMK thus were on notice as of that date that any future settlement payments to Class TT would violate the Restraining Notices as well. Katzman nevertheless did not inform Wimbledon that the $5 million payment was imminent.

44. Katzman and BMK had a duty not to violate the Restraining Notices or to assist their clients in violating the Restraining Notices.

45. By refusing to inform Wimbledon of the $5 million settlement payment, and by refusing to produce the Settlement Agreement based on a specious claim of privilege, Katzman and BMK prevented Wimbledon from taking steps to stop that future payment. As a result, Katzman and BMK aided and abetted a further violation of the Restraining Notices.

46. Katzman's and BMK's actions were, at a minimum, negligent.

47. As a direct and proximate result of Katzman's and BMK's negligence, Wimbledon has suffered damages in an amount to be determined at trial, but not less than $5 million, plus pre- and post-judgment interest.

### Third Cause of Action
### (Gross Negligence -- $2.412 Million Transfer)

48. Wimbledon repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

49. Katzman and BMK had a duty not to violate the Restraining Notices or to assist their clients in violating the Restraining Notices.

14

50. As described in further detail above, Katzman and BMK breached that duty by assisting their clients in transferring $2.412 million in violation of the Restraining Notices.

51. Katzman's and BMK's actions were, at a minimum, grossly negligent.

52. As a direct and proximate result of Katzman's and BMK's gross negligence, Wimbledon has suffered damages in an amount to be determined at trial, but not less than $2.412 million, plus pre- and post-judgment interest.

### Fourth Cause of Action
### (Gross Negligence -- $5 Million Transfer)

53. Wimbledon repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

54. Katzman and BMK had a duty not to violate the Restraining Notices or to assist their clients in violating the Restraining Notices.

55. As described in further detail above, Katzman and BMK breached that duty by assisting their clients in transferring $5 million in violation of the Restraining Notices.

56. Katzman's and BMK's actions were, at a minimum, grossly negligent.

57. As a direct and proximate result of Katzman's and BMK's gross negligence, Wimbledon has suffered damages in an amount to be determined at trial, but not less than $5 million, plus pre- and post-judgment interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Wimbledon respectfully requests that the Court:

(a) Award Wimbledon compensatory damages, including prejudgment interest and post-judgment interest, in an amount to be proven at trial, but in no event less than $7.412 million;

(b) Award Wimbledon all expenses for this action, including costs and fees; and

15

(c)     Award Wimbledon such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Wimbledon demands a jury trial of all issues so triable.

Dated: New York, New York
August 30, 2018

                 KAPLAN RICE LLP

                 By:    /s/ Joseph A. Matteo
                          Howard J. Kaplan
                          Michelle A. Rice
                          Joseph A. Matteo

                 142 West 57th Street
                 Suite 4A
                 New York, New York 10019
                 (212) 235-0300 (telephone)
                 (212) 235-0301 (facsimile)

                 *Attorneys for Plaintiff Wimbledon Financing*
                 *Master Fund, Ltd. (In Official Liquidation),*
                 *as Assignee of Weston Capital Partners*
                 *Master Fund II, Ltd.*