UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WIMBLEDON FINANCING MASTER FUND LTD.,

Plaintiff,

-v-

BIENERT MILLER & KATZMAN, PLC *and* STEVEN J.
KATZMAN,

Defendants.

---

18 Civ. 8004 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case arises from competing claims by creditors to recover money from a convicted fraudster, David Bergstein ("Bergstein"). The plaintiff here, Wimbledon Financing Master Fund Ltd. ("Wimbledon"), a creditor of Bergstein's, obtained an $8,497,578.75 money judgment against Bergstein and others. After Wimbledon had served a restraining notice on Bergstein, but before it took other steps to secure its priority, Bergstein, through his lawyer Steven J. Katzman ("Katzman"), negotiated a settlement agreement with a different Bergstein creditor, The Wimbledon Fund, SPC ("Class TT"). Katzman then facilitated two sequential wire transfers from Bergstein to Class TT to satisfy the settlement agreement, one for $2.412 million, the next for $5 million. As pled, these transfers left Bergstein without funds to pay the judgment against Wimbledon.

Wimbledon initially sought relief in New York state court against Katzman, his law firm, Bienert Miller & Katzman PLC ("BMK"), and Bergstein. Wimbledon moved for contempt against them, based on the first of the wire transfers to Class TT. Wimbledon did not then know

about the second, larger wire transfer. That action resulted in a finding of contempt against Katzman, BMK, and Bergstein. But the state court declined to order Katzman and BMK to pay to Wimbledon the $2.412 million they had caused their client to divert in violation of the restraining notice. It found that remedy excessive. To the extent the contempt sanction had a monetary component, it required Katzman and BMK only to pay Wimbledon's attorneys fees and associated costs.

Wimbledon now sues Katzman and BMK in federal court, for negligence and gross negligence. As relief, it seeks the sums ($2.412 million and $5 million) that Katzman and BMK caused Bergstein to pay in violation of its restraining notice.

Pending now are the parties' cross-motions for summary judgment. These raise, among others, issues of *res judicata*. For the following reasons, the Court grants defendants' summary judgment motion in part. This ruling precludes Wimbledon's claims that seek recovery from Katzman and BMK arising from the $2.412 million transfer. The Court denies the remaining motions. This leaves standing, and to be tried to a jury, Wimbledon's claims against Katzman and BMK arising from the $5 million transfer.

## I.    Background

### A.    Factual Background[1]

#### 1.    Overview

This litigation is the latest installment in a contest between two victims of Bergstein's fraud—plaintiff Wimbledon and non-party Class TT—to recover their losses from the same pot

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion—specifically, the parties' Joint Statement of Undisputed Facts, Dkt. 66 ("JSF"); Wimbledon's Local Rule 56.1 statement of material facts, Dkt. 70 ("Wimbledon 56.1"); the declaration of Joseph A. Matteo in support of Wimbledon's motion, Dkt. 71 ("Matteo Decl."), and exhibits attached thereto; defendants' Local Rule 56.1

of money.  Wimbledon and Class TT each sought to enforce judgments against Bergstein and his

fraudulent transferees.  In July 2017, after securing its judgment in the supreme court of New

York County for more than $8 million, Wimbledon served restraining notices on Bergstein and

his lawyers to prevent disbursement of Bergstein's funds, including funds held in BMK's client

trust account on behalf of Bergstein that had been enjoined in the Class TT litigation.  The next

month, Katzman—Bergstein's lawyer in a suit brought by Class TT in California federal court—

negotiated and executed a settlement with Class TT.  In connection with that settlement,

Bergstein, despite having received Wimbledon's restraining notices, participated, in August 2017

and in December 2017, respectively, in sending $2.412 million and $5 million of Bergstein's

restrained funds to Class TT.

 In February 2018, Wimbledon moved in New York state supreme court in Manhattan for

contempt against Bergstein and his professional legal corporation, BMK.  The court found the

two in contempt, a judgment affirmed on appeal in June 2019.  In March 2019, Wimbledon also

---

counter-statement and additional statement of material facts, Dkt. 74, Ex. 1 ("Def. 56.1"); the
declaration of Richard A. Hubell in support of defendants' motion, and exhibits attached thereto,
Dkt. 72 ("Hubell Decl."); Wimbledon's Local Rule 56.1 counter-statement and additional
statement of material facts, Dkt. 83 ("Wimbledon Reply 56.1"); the declaration of Joseph A.
Matteo in opposition to defendants' motion, Dkt. 82 ("Matteo Opp. Decl."); and Defendants'
Local Rule 56.1 counter-statement to Wimbledon's statement of additional material facts, Dkt.
86 ("Def. Reply 56.1").

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.
Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary
evidence, and denied by a conclusory statement by the other party without citation to conflicting
testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local
Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for purposes
of the motion unless specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[] must be followed by
citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

sued Class TT to recover the second $5 million installment of the settlement funds, which was dismissed by the New York state supreme court. Class TT and Wimbledon later settled while an appeal was pending. In this lawsuit, Wimbledon seeks to hold Bergstein and BMK liable for the sum it would have received had Bergstein and BMK not, as alleged, negligently permitted Bergstein's restrained funds to be delivered to Class TT.

### 2.    Parties and Relevant Non-Parties

Wimbledon is an exempted liability company organized under the laws of the Cayman Islands. JSF ¶ 1. On July 17, 2014, the Grand Court of the Cayman Islands, Financial Services Division, appointed Chris Johnson and Russell Homer as joint official liquidators to conduct a court-supervised liquidation of Wimbledon. *Id.* ¶ 2.

BMK was a California professional legal corporation with its office located in San Clemente, California. *Id.* ¶ 3. Katzman was a BMK shareholder. *Id.* ¶ 4.

Non-party Bergstein resided in Hidden Hills, California, and is currently incarcerated in California. *Id.* ¶ 6. On March 1, 2018, a jury in this District found Bergstein guilty of seven counts of securities fraud, investment advisor fraud, wire fraud, and conspiracy to commit those offenses against three entities: Wimbledon, Class TT, and Weston Capital Partners Master Fund II, Ltd. ("Partners II"). *Id.* ¶ 64.

Class TT is a Cayman Islands segregated portfolio company. *Id.* ¶ 9. Partners II is an investment fund organized under Cayman Islands law. *Id.* ¶ 8.

Katzman and BMK represented Bergstein and non-party Graybox LLC ("Graybox") in a civil suit brought by Class TT to enforce a judgment against Bergstein and Graybox. Graybox is a limited liability company organized under Nevada laws. *Id.* ¶ 7. Bergstein is the sole owner and officer of Graybox. Wimbledon 56.1 ¶ 1.

4

### 3.    Events Leading to Class TT's Claim to Bergstein's Funds

#### a.    *Background of Bergstein's liability to Class TT*

In December 2010, Bergstein and Kiarash Jam ("Jam") established Swartz IP Services

Group, Inc. ("SIP").  *See* Hubell Decl., Ex. Q at 2.  In November 2011, Class TT entered into a

note purchase agreement ("NPA") with SIP, pursuant to which Class TT was to pay SIP in

exchange for notes and warrants to purchase stock in a separate company.  *See* Hubell Decl., Ex.

I.  On February 8, 2013, Class TT sued SIP for breach of contract arising out of the NPA in New

York  supreme court, county of New York.  *See Wimbledon Fund, SPC, v. Advisory IP Services*

*Inc.*, Index No. 650446/2013; JSF ¶ 10; Hubell Decl., Ex. L.  On November 24, 2015, Class TT

obtained a judgment in the amount of $23,051,971.31 against SIP (the "Class TT Judgment").

*See* JSF ¶ 21; Hubell Decl., Ex. M.

#### b.    *Class TT sues Bergstein and Graybox in Texas and California to enforce its judgment*

On July 30, 2015, Class TT sought a judicial declaration in the Southern District of Texas

to hold SIP's directors, officers, and shareholders—including Bergstein and Jam—jointly and

severally liable for the Class TT Judgment (the "Texas Action").  *See* JSF ¶ 13.  On August 28,

2015, Class TT filed a separate lawsuit in the Central District of California seeking monetary and

injunctive relief to recover its investments in SIP from alleged fraudulent transferees, including

Graybox (the "California Action").  *See* JSF ¶ 14; Hubell Decl., Ex. P.  Graybox was alleged to

have received $2.412 million as a result of fraudulent transfers of Class TT's investments in SIP.

*See* JSF ¶ 14.  In both the Texas and California actions, Class TT did not assert a claim for

breach of contract, either express or implied.  Wimbledon 56.1 ¶¶ 2–3.  On April 1, 2016, the

Texas Action was transferred to the Central District of California and consolidated with the

California Action.  *See* JSF ¶ 24.

      c.  *Graybox, a fraudulent transferee, enters into an unrelated settlement*
         *in a bankruptcy proceeding, pursuant to which it receives $2.9 million*

On August 15, 2015, Bergstein and Graybox settled claims that they had with Aramid

Entertainment Fund, Ltd. ("Aramid") and its former counsel in Aramid's bankruptcy proceeding

(the "Aramid bankruptcy"). *See* JSF ¶ 15; Katzman Decl. ¶¶ 6–7. Pursuant to the settlement,

Graybox was to receive $2.9 million (the "Graybox settlement proceeds"). JSF ¶ 15. Bergstein

and Graybox were represented by BMK in that proceeding; thus, the Graybox settlement

proceeds were to be delivered to BMK's client trust account. *Id.* ¶ 16; Katzman Decl. ¶¶ 6–7;

Hubell Decl., Exs. O, Q. Wimbledon, through its counsel in this action, Kaplan Rice, appeared

and participated in the Aramid bankruptcy. *See* Def. 56.1 ¶ 77; Hubell Decl., Ex. E at 105.

      d.  *Class TT obtains against the Graybox settlement funds a preliminary*
         *injunction, which is affirmed by the Ninth Circuit*

On September 9, 2015, after Graybox's claims in the Aramid bankruptcy were settled but

before the funds had been transferred to BMK's client trust account, Class TT filed a motion for

a preliminary injunction in the California Action to enjoin the Graybox settlement proceeds from

being disbursed to Graybox. JSF ¶ 17. On September 29, 2015, the court enjoined Graybox

from transferring $2.412 million out of its accounts upon receipt of the $2.9 million in settlement

funds (the "Preliminary Injunction"). *Id.* ¶ 18. On October 20, 2015, the court extended the

injunction to BMK's client trust account. *Id.* ¶ 20. On April 18, 2016, the Ninth Circuit

affirmed the injunction. *Id.* ¶ 27; Katzman Decl. ¶ 14; Hubell Decl., Ex. R.

      e.  *Bergstein is indicted; the California Action is stayed*

In November 2016, while the California Action was pending, Bergstein was indicted in

this District. JSF ¶ 28. He was charged with seven counts, including investment advisory fraud,

securities fraud, wire fraud, and conspiracy to commit those offenses. *Id.* ¶ 30. On December 7,

2016, Bergstein moved to stay the California Action pending resolution of his criminal case. *Id.*

¶ 31.  On January 17, 2017, that motion was granted.  *Id.* ¶ 34.  The California Action remained stayed until August 2017, when the settlement with Class TT was reached.  *Id.* ¶¶ 49–50.

### 4.      Events Leading to Wimbledon's Claim to the Funds

#### a.    *Wimbledon is assigned and seeks to enforce the Arius Libra judgment*

On April 4, 2013, Partners II obtained a judgment against Arius Libra, Inc. ("Arius Libra") in the amount of $6,619,586.77, in New York state supreme court in Manhattan (the "Arius Libra judgment").  *See id.* ¶ 11.  As of October 16, 2015, Partners II had assigned the Arius Libra Judgment to Wimbledon.  *Id.* ¶¶ 19, 28.

On January 22, 2016, Wimbledon commenced a special proceeding in the commercial division of the New York state supreme court in Manhattan, captioned *Wimbledon Financing Master Fund, Ltd. v. David Bergstein et al.*, No. 150584/2016, against Bergstein and Graybox, among others, to enforce the Arius Libra judgment (the "Turnover Proceeding").  *Id.* ¶ 22.  To satisfy the Arius Libra judgment, Wimbledon sought an order under sections 5225 and 5227 of the New York Civil Practice Law and Rules (the "CPLR") directing Bergstein and others to turn over the proceeds of various conveyances each had received.  *Id.* ¶ 23.

In December 2016, Bergstein and Graybox's counsel at Sills Cummis & Gross, P.C. ("Sills Cummis"), moved to admit Katzman *pro hac vice* in the Turnover Proceeding on behalf of Bergstein and Graybox.  *Id.* ¶ 32.  In connection with that motion, Katzman submitted an affidavit attesting that he had "become familiar with the standards of professional conduct imposed upon members of the New York Bar and relevant statutes, rules and procedures and will abide by them."  Wimbledon 56.1 ¶ 6.  Katzman also "agree[d] to be subject to the jurisdiction of the Courts of the State of New York with respect to any acts occurring during the course of [his] participation in this matter."  *Id.* ¶ 7.  On January 10, 2017, the supreme court admitted Katzman *pro hac vice* in the Turnover Proceeding.  *Id.* ¶ 33.

> b.  *The New York state supreme court grants summary judgment to*
> *Wimbledon and judgment is entered against Bergstein and Graybox*

On July 17, 2017, the New York state supreme court granted summary judgment in

Wimbledon's favor in the Turnover Proceeding.  *See id.* ¶ 35.  On July 21, 2017, judgment was

entered in Wimbledon's favor against (a) Graybox and Bergstein, jointly and severally for

$765,068.49, including prejudgment interest; (b) Iskra Enterprises LLC and Bergstein, jointly

and severally for $227,560.27, including prejudgment interest; (c) Henry N. Jannol and

Bergstein, jointly and severally for $3,365,097.95, including prejudgment interest; (d) Spillane

Weingarten LLP and Bergstein, jointly and severally for $303,068.49, including prejudgment

interest; (e) Weston Capital Asset Management, LLC and Bergstein, jointly and severally for

$1,383,558.90, including prejudgment interest; (f) Gerova Management Inc. and Bergstein,

jointly and severally for $765,068.49, including prejudgment interest; (g) K Jam Media, Inc. and

Bergstein, jointly and severally for $612,054.79, including prejudgment interest; and (h)

Bergstein for $1,076,101.37, including prejudgment interest (the "Turnover Judgment").  *Id.* ¶

36.

On November 20, 2018, the New York state appellate division affirmed the summary

judgment decision and the related judgment in the Turnover Proceeding.  *See Wimbledon*

*Financing Master Fund, Ltd. v. Bergstein*, 166 A.D.3d 496 90 N.Y.S.3d 12 (N.Y. App. Div.1st

Dep't 2018).  JSF ¶ 76.

**5.      The Restraining Notices and Subsequent Events**

> a.  *Wimbledon serves, and Katzman receives, the Restraining Notices*

On July 21, 2017—the same day the judgment was entered in the Turnover Proceeding—

Wimbledon's counsel served restraining notices on Bergstein and Graybox via certified mail,

return receipt requested, pursuant to CPLR § 5222 (the "Restraining Notices").  *Id.* ¶ 37.  Each

Restraining Notice stated that Bergstein and Graybox were "hereby forbidden to make or suffer any sale, assignment, transfer, or interference with any property in which You have an interest, except upon direction of the sheriff or pursuant to an order of the court, until the Judgment is satisfied or vacated." Wimbledon 56.1 ¶ 8. Each Restraining Notice stated that "disobedience of this Restraining Notice is punishable as contempt of court." *Id.* ¶ 9. And each Restraining Notice included the text of CPLR § 5222(b), which provides in part that

> a judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated.

*Id.* ¶ 10. On July 25, 2017, the Restraining Notices were delivered to Bergstein by certified mail. JSF ¶ 42.

At 6:03 p.m. on July 21, 2017, Wimbledon's counsel also emailed the Restraining Notices to attorneys at Sills Cummis. *Id.* ¶ 38. Ten minutes later, Andrew Sherman, a Sills Cummis attorney, forwarded the Restraining Notices to Katzman and Bisconti. *Id.* ¶ 39. Katzman received Sherman's email and the attached Restraining Notices on July 21, 2017. *Id.* ¶ 40. Katzman has admitted under oath that, "upon receipt, I briefly glanced through the Restraining Notices," but, he has claimed, he "did not review them or analyze them in depth." Wimbledon 56.1 ¶ 11. Bisconti also received the Restraining Notices on July 21, 2017. JSF ¶ 41. He read the Restraining Notices when he received them. Wimbledon 56.1 ¶ 12.

> ### b. *Katzman and BMK negotiate a settlement with Class TT and transfer funds pursuant to the settlement*

On August 10, 2017—three weeks after receiving the Restraining Notices—Katzman and Bergstein participated in person in a settlement meeting with representatives of Class TT in New York, New York. JSF ¶ 43. During that meeting, Graybox, Bergstein and Class TT drafted and

executed a settlement term sheet (the "Term Sheet"). *Id.* Katzman and Bisconti assisted Bergstein in negotiating the terms of the Term Sheet. Wimbledon 56.1 ¶ 13.

The Term Sheet provided a total settlement payment to Class TT in the amount of $9.4 million, payable in three installments: first, the "immediate[]" release of the Enjoined Funds by wire transfer to a client Trust Account; second, SIP to wire $5 million to a client trust account within thirty days of execution of the written settlement agreement by Bergstein, Graybox, SIP and Class TT; and third, SIP to pay $2 million to a client trust account within twelve months of the execution of the parties' written settlement agreement. *Id.* ¶ 14. The Term Sheet contemplated that the parties would enter into a final written settlement agreement: "At the option of the parties, this Term Sheet and the parties' contemplated settlement shall automatically become null and void if the Settlement Agreement is not executed and the Frozen Funds are not wired to [Class TT] by August 25, 2017." *Id.* ¶ 15; Hubell Decl., Ex. Z.

On August 16, 2017, BMK filed a joint stipulation in the California Federal Action by Bergstein, Graybox, and Class TT advising the court of the parties' confidential settlement, and stipulating, subject to court approval, to an order directing BMK to deliver the Enjoined Funds to Class TT. JSF ¶ 47. The California Federal Action had been stayed since January 2017, when the California Federal Court granted Bergstein's and Graybox's motion to stay the action pending Bergstein's criminal trial in this District. Wimbledon 56.1 ¶ 16. The stipulation accordingly asked the California Federal Court to lift the stay "for the sole and limited purpose of modifying the terms of the Preliminary Injunction to allow BMK to release the full amount of the Frozen Funds to the [Class TT]." JSF ¶ 48.

Katzman, BMK, Bergstein, and Graybox did not inform the California Federal Court that the Turnover Judgment had been entered against Bergstein and Graybox, or that Bergstein and

Graybox had received and were subject to the Restraining Notices. Wimbledon 56.1 ¶¶ 17–18. Nor did Katzman, BMK, Bergstein, and or Graybox seek permission from the New York state supreme court to release the Enjoined Funds to Class TT. *Id.* ¶ 19. Katzman, BMK, Bergstein, and Graybox also did not inform Wimbledon of the application to the California Federal Court for permission to transfer the Enjoined Funds to Class TT. *Id.* ¶ 20.

On August 17, 2017, the California Federal Court entered an order approving the joint stipulation. JSF ¶ 49. The California Federal Court ordered that "[t]he stay of this case, entered by this Court on January 9, 2017 . . . , is lifted for the sole and limited purpose of modifying the terms of the preliminary injunction entered by this Court on October 20, 2015 . . . , to allow [BMK] to release the amount of $2,412,000 (the 'Frozen Funds') to the Fund in furtherance of the parties' settlement of this case." *Id.* ¶ 50. The California Federal Court ordered that "[u]pon entry of this Order, BMK is directed to pay the Frozen Funds to the Fund pursuant to instructions to be provided by the Fund's undersigned counsel." *Id.* ¶ 51.

On August 21, 2017, BMK transferred the formerly enjoined funds to Class TT by wiring those funds to the client trust account of its lawyer. *Id.* ¶ 52. Between November 16 and 21, 2017, Graybox, Bergstein and Class TT executed a "Confidential Compromise Settlement and Release Agreement" (the "Confidential Settlement Agreement"). *Id.* ¶ 53.

### 6.   The Civil Contempt Motion

#### *a.  Wimbledon's discovery of the Restraining Notice violation*

On November 27, 2017, Sills Cummis filed a motion to withdraw as counsel to Bergstein and Graybox, among others, in the Turnover Proceeding. *See* Wimbledon 56.1 ¶ 25. During a December 5, 2017 hearing on Sills Cummis's motion, Wimbledon's counsel, Howard Kaplan, notified the New York state supreme court that "[w]e just discovered this week that Graybox— we have a judgment against Graybox that your Honor entered for $800,000. Graybox had

money sitting in [Katzman's], Bienert's escrow account in California that was frozen by court order out there that was also subject to our restraining notice. We just learned that they transferred that to a third-party." *Id.* ¶ 26; Matteo Decl., Ex. 15 at 24. Counsel for Sills Cummis told the supreme court that "[w]hen Mr. Kaplan brought this up in the hallway, it's the first time that Sills Cummis learned of it. We did not know of this issue." Wimbledon 56.1 ¶ 27; Matteo Decl., Ex. 15 at 25. The supreme court granted Sills Cummis's motion to withdraw, but denied Sills Cummis's oral request to permit Katzman to withdraw his *pro hac vice* admission. Wimbledon 56.1 ¶ 28; Matteo Decl., Ex. 15 at 26; *id.*, Ex. 16.

> b. *Wimbledon's communications with Katzman and the second settlement payment*

Through a letter dated December 8, 2017, Kaplan informed Katzman that "[it] recently became aware that, notwithstanding the restraining notices, the $2,412,000 belonging to Bergstein and Graybox was distributed to the TT Fund." Wimbledon 56.1 ¶ 29; Matteo Decl., Ex. 17 at 2. Kaplan's letter stated that the distribution of the Enjoined Funds, "which post-dated service of Wimbledon's restraining notices by four weeks, was in violation of the restraining notices." Wimbledon 56.1 ¶ 30; Matteo Decl., Ex. 17 at 2.

Kaplan asked Katzman to (i) provide BMK's communications with others concerning the Judgment and Restraining Notices; (ii) produce the settlement agreement among Bergstein, Graybox and Class TT; and (iii) explain the circumstances surrounding the distribution to Class TT. Wimbledon 56.1 ¶ 31; Matteo Decl., Ex. 17 at 2. By letter dated December 14, 2017, Katzman refused these demands. Wimbledon 56.1 ¶ 32; Matteo Decl., Ex. 18.

The Settlement Agreement provided that SIP or its designee shall wire $5 million to a Class TT client trust account within 30 days of the agreement's execution. Wimbledon 56.1 ¶

33.  Because the Settlement Agreement was fully executed on November 21, 2017, the $5 million payment was due on or before December 21, 2017.  *Id.*; Matteo Decl. Ex. 19 at 4.

Citing Katzman's declaration, defendants claim that "without any prior knowledge of or involvement by the [d]efendants," Xanadu Media Group, Inc. ("Xanadu") wired $5 million to Class TT.  *See* Def. 56.1 ¶ 109.  That factual claim is refuted by documentary evidence.  On December 14, 2017, Katzman emailed Jim Walker, counsel for Class TT, copying Bisconti, stating: "Our client is planning on making the 5 mm payment per the settlement agreement.  Are the wire instructions you provided to us for the funds held per the preliminary injunction, attached, the ones we should use?  If not, please provide different wire instructions."  Wimbledon 56.1 ¶ 34; Matteo Decl., Ex. 20.  On December 15, 2017, Bisconti emailed Walker, copying Katzman, stating: "Attached are drafts of the proposed stipulation and order dismissing the action pursuant to paragraph A.5. of the confidential settlement agreement.  Let us know if you have any changes.  If not, once receipt of the $5M payment is confirmed, we can circulate to the other defendants being dismissed to confirm they authorize to use their electronic signatures, and we can file with the court.  Thanks."  Wimbledon 56.1 ¶ 35; Matteo Decl., Ex. 21.

On December 19, 2017, Xanadu wired a $5 million payment to the client trust account of Class TT's lawyer.  JSF ¶ 61.

On December 22, 2017, Kaplan sent Katzman a letter in which he stated: "We would like to provide you with another opportunity to provide the information requested in our December 8th letter before we move forward with our motion for contempt.  Please promptly provide this information."  Wimbledon 56.1 ¶ 36.  Wimbledon did not receive a response to this letter.  *Id.* ¶ 37.

*c.  Wimbledon's contempt motion—and the contempt decision*

On February 5, 2018, Wimbledon moved in New York state supreme court for an order

of civil contempt against Bergstein, Graybox, Katzman, and BMK in the Turnover Proceeding

concerning the transfer of the Enjoined Funds to Class TT.[2]  JSF ¶ 63.  On March 31, 2018,

Katzman and BMK submitted their opposition to that motion.  Wimbledon 56.1 ¶ 42; Matteo

Decl., Ex. 24.  Bergstein and Graybox also submitted opposition papers.  Wimbledon 56.1 ¶ 44;

*See* Matteo Decl., Ex. 2.

At argument on April 4, 2018, the supreme court ordered Katzman and BMK to produce

the Confidential Settlement agreement to Wimbledon; it was produced the following day.  JSF ¶¶

65–66.  On April 20, 2018, the supreme court ordered Katzman and Sills Cummis to submit

affirmations "indicating if, when, and how Mr. Katzman and/or BMK were notified of and/or

provided with the restraining notices that were served on Bergstein [and] Graybox on 7/25/17."

Wimbledon 56.1 ¶ 48; Matteo Decl., Ex. 27.  The supreme court directed that Katzman's counsel

"may file a 7-page brief concerning said affirmations."  Wimbledon 56.1 ¶ 49.

On May 10, 2018, the supreme court issued a decision and order on Wimbledon's

contempt motion.  JSF ¶ 68.  It held Bergstein, Graybox, Katzman, and BMK in civil contempt

for violating the Restraining Notices by transferring the Enjoined Funds to Class TT.  It

specifically found that "[t]here is no question of fact that the Bergstein Parties knowingly and

willfully violated the Restraining Notices."  Matteo Decl., Ex. 34.  It ordered them to pay

Wimbledon "the reasonable attorneys' fees expended in connection with the instant motion,

which will be calculated by a Special Referee."  Wimbledon 56.1 ¶ 58; Matteo Decl., Ex. 34.

---

[2] Wimbledon had sought an order of contempt only as to the first $2.412 million settlement
payment because it did not learn that the second payment had been made until after it had filed
its motion for contempt.  *See* Dkt. 99 at 40.  It learned of the $5 million payment about a month
before the Contempt Order was entered.  *See* Hubell Decl., Ex. LL.

Important here, as to actual damages, the court found that, although "a party held in contempt for violating a restraining notice may be ordered to pay the full amount of money that would have been available to satisfy the judgment but for its contempt," holding Katzman liable for the full $2.412 million would be "far too harsh." Matteo Decl., Ex. 34 (internal quotations omitted). The court explained that "[t]his public admonishment, placing restrictions on his future *pro hac vice* applications, and compelling him to pay Wimbledon's attorneys' fees, is punishment enough." *Id.*

On May 17, 2018, BMK filed a copy of the contempt order with the court in the California Federal Action, as directed by the New York state supreme court. JSF ¶ 69.

On June 4, 2019, the New York Appellate Division, First Department, affirmed the Contempt Order in part and modified it in part. *See Wimbledon Financing Master Fund, Ltd. v. Bergstein, et al.*, 173 A.D.3d 401, 103 N.Y.S.3d 378 (N.Y. App. Div. 2019). *Id.* ¶ 77.

On October 3, 2019, the Appellate Division denied Katzman's and BMK's motion to reargue their challenge to Wimbledon's motion for civil contempt or, in the alternative, for leave to appeal the Contempt Order to the New York Court of Appeals. *Id.* ¶ 81

### 7.    Wimbledon's Litigation Against Class TT

On March 7, 2019, Wimbledon filed suit against Class TT in New York state supreme court in Manhattan, seeking to set aside the $5 million conveyance to Class TT that is a subject of this action. *See* Hubell Decl., Ex. LL; *Wimbledon Fin. Master Fund, Ltd., v. The Wimbledon Fund, SPC (Class TT)*, Index No. 651376/2019. On October 28, 2019, the supreme court granted Class TT's motion to dismiss Wimbledon's suit. JSF ¶ 81. It held: "Wimbledon's petition is dismissed because CPLR § 5202(b) is the only basis on which Wimbledon challenges the $5 million transfer to Class TT . . . [,] [and] CPLR § 5202(b), by its terms, does not support even potentially granting the relief sought." Hubell Decl., Ex. MM at 8. CPLR § 5202(b), the

court stated, "gives judgment creditors who have obtained a turnover order priority over subsequent creditors and permits the imposition of liability on subsequent creditors who receive assets of the judgment debtor in bad faith and while on notice of the other creditor's priority." *Id.* at 2. But, it noted, Wimbledon's judgment against Bergstein and his confederates was a monetary judgment, and did not direct delivery, turnover, or any other article 52 relief within the meaning of CPLR § 5202(b). *Id.* at 8–9. As such, the court held, Wimbledon's judgment was not entitled to priority over Class TT's settlement. *Id.* at 9.

### 8. Status of Wimbledon's Efforts to Collect from Bergstein

The record does not establish what, if any, remaining assets the incarcerated Bergstein has. The parties have represented that, although Wimbledon has reached a settlement in principle with Bergstein, Bergstein has stated "that he will not sign the settlement agreement until he reaches certain agreements with the government in connection with his criminal case, but to date has not been able to do so." Dkt. 97. The terms of the settlement in principle are not part of the record. *Id.* Wimbledon has advised Bergstein that it plans to recommence post-judgment enforcement proceedings against him. *Id.*

### B. Procedural History

On August 31, 2018, defendants removed this action from the New York supreme court in Manhattan, where Wimbledon had brought suit. Dkt. 1. On September 27, 2018, the Court stayed the case pending a resolution of a motion pending in the Central District of California, in which defendants sought to enjoin this suit. Dkt. 9. On November 14, 2018, the Court lifted the stay following that court's ruling transferring the California action to this District. Dkt. 11. On December 14, 2018, defendants filed an answer to the complaint. Dkt. 17.

As to the summary judgment motions, on November 5, 2019, after fact discovery closed, the parties filed a joint statement of undisputed facts. Dkt. 66. Thereafter, between November

22, 2019, and January 27, 2020, the parties filed their respective summary judgment motions,

oppositions, and supporting materials, as listed above. *See* note 1, *supra.*

## II.     Applicable Legal Standards

### A.     Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the light

most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir.

2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment," because "conclusory allegations or denials cannot by themselves create a genuine

issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166

(2d Cir. 2010) (internal citation omitted).  "Only disputes over facts that might affect the

outcome of the suit under the governing law" will preclude a grant of summary judgment.

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are

genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought."

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137

(2d Cir. 2003)).

### III.    Discussion

The parties cross-move for summary judgment on each of Wimbledon's four claims. These are for negligence and gross negligence with respect to both the $2.412 and $5 million payments to Class TT.

As to the $2.412 million tranche, Wimbledon moves for summary judgment on the ground of issue prelusion, based on the ruling of the New York state supreme court finding Katzman and BMK in contempt.  It argues that that court necessarily found the defendants willfully negligent in violating the Restraining Notices.  As to both tranches, Wimbledon argues that the evidence shows that defendants were both negligent and grossly negligent in actively facilitating the payments in violation of the Restraining Notice.

Defendants cross-move for summary judgment on all claims.  They argue that the claims as to the $2.412 million transfer are precluded by the contempt order and the claims as to the $5 million transfer are precluded by the Class TT litigation.  They also argue that they did not owe a duty to Wimbledon; that Wimbledon has not adduced sufficient evidence as to causation; and that defendants' conduct was protected by the California litigation privilege.

### A.    Defendants' Motions Based on Claim and Issue Preclusion

The Court first addresses the extent to which this Court's review is precluded by New York state supreme court's (1) contempt order against Katzman and BMK; and (2) decision resolving the Class TT litigation.

#### 1.    Applicable Legal Standards

"Under the doctrine of *res judicata*, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998)) (emphasis omitted); *see also Federated Dep't*

*Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). "*Res judicata* (claim preclusion) is distinct from the related doctrine of collateral estoppel (issue preclusion), which 'refers to the preclusive effect of a judgment that prevents a party from litigating, for a second time, an issue of fact or law that has once been decided.'" *MFW Assocs., LLC v. Plausteiner*, No. 15 Civ. 2513 (PAE), 2017 WL 2418277, at \*8 (S.D.N.Y. June 2, 2017), *aff'd*, 729 F. App'x 51 (2d Cir. 2018) (summary order) (quoting *Yeiser v. GMAC Mortgage Corp.*, 535 F. Supp. 2d 413, 421 (S.D.N.Y. 2008)).

"[T]he defense of *res judicata* . . . may be brought, under appropriate circumstances, either via a motion to dismiss or a motion for summary judgment." *Sassower v. Abrams*, 833 F. Supp. 253, 264 n.18 (S.D.N.Y. 1993). The party moving to dismiss on *res judicata* grounds must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. NYC Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted).

Under the defense of collateral estoppel, any "issue raised in a subsequent suit" is precluded if it "was 'actually and necessarily determined' in a prior litigation; this precludes a party from relitigating the same issue based on a different cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979). To determine whether such estoppel applies, a court examines whether "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; [and] (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.

1997) (quoting *Cent. Hudson Gas & Elec. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)).

### 2. Does the Contempt Proceeding and Order Preclude Wimbledon's Claims as to the $2.412 Million Transfer?

Defendants argue that claim and/or issue preclusion bar Wimbledon's negligence and gross negligence claims for $2.412 million—the money released in the first tranche of the Class TT settlement, and which was the object of Wimbledon's contempt proceeding in state court. Defendants argue that because the contempt proceeding addressed the same "transaction," *i.e.*, the $2.412 million transfer, Wimbledon is precluded from now asserting a new claim to recover on that transaction. Alternatively, defendants argue that Wimbledon's bid to relitigate the issue of the actual damages it is due from BMK and Katzman is barred by issue preclusion, because the state court considered—and rejected—Wimbledon's bid to recover its claimed actual damages of $2.412 million, awarding it only the fees and costs it incurred in bringing the contempt action.

In general, an earlier contempt proceeding can preclude a later suit for damages, to the extent the petitioner in the contempt proceeding could there have brought additional claims to recover damages from the allegedly contumacious conduct. *Compare Nabisco, Inc. v. Amtech Int'l, Inc.*, No. 95 Civ. 9699 (LBS), 2000 WL 35854, at *8 (S.D.N.Y. Jan. 18, 2000) (claim for damages not barred by *res judicata* based on earlier contempt proceeding because claim could not have been brought in that proceeding) *with Dep't of Hous. Pres. & Dev. of City of N.Y. v. Ieraci*, 156 Misc. 2d 646, 652, 594 N.Y.S.2d 574, 578 (Civ. Ct. 1992) (claim barred by *res judicata* based on prior contempt proceeding); *Culver v. Culver*, 37 Misc. 3d 1231(A), 966 N.Y.S.2d 345 (Sup. Ct. 2012) (same); *cf. Porter v. Shah*, 606 F.3d 809, 814 (D.C. Cir. 2010); *Lee v. Spoden*, 290 Va. 235, 249–50 (2015).

The *res judicata* analysis here is complicated by the fact that Wimbledon brought its contempt proceeding in supreme court under New York Judiciary Law § 753 and was awarded damages under § 773.  Section 753 authorizes contempt proceedings for, *inter alia*, violations of restraining notices.  Once a court has made a finding of contempt under that statute, as the state court did as to BMK and Katzman here, it must then determine the "amount of fine" under N.Y. Judiciary Law § 773, which provides:

> If an actual loss or injury has been caused to a party to an action or special proceeding, by reason of the misconduct proved against the offender, and the case is not one where it is specially prescribed by law, that an action may be maintained to recover damages for the loss or injury, a fine, sufficient to indemnify the aggrieved party, must be imposed upon the offender, and collected, and paid over to the aggrieved party, under the direction of the court.  The payment and acceptance of such a fine constitute a bar to an action by the aggrieved party, to recover damages for the loss or injury.

Wimbledon argues that normal claim preclusion principles do not apply here based on § 773.  It asserts that "[u]nder New York law, a plaintiff may pursue a party for contempt in one proceeding and concurrently proceed against that same party for damages in another action."  *See* Dkt. 81 ("Pl. Oppo. Memo") at 16–17.

In support, Wimbledon relies primarily on *Jos. Riedel Glass Works v. Francis W. Kurtz & Co.*, 260 A.D. 163, 20 N.Y.S.2d 938 (N.Y. App. Div. 1940), *order aff'd*, 287 N.Y. 636, 39 N.E.2d 270 (1941).  In *Riedel*, the plaintiff had prevailed in a contempt proceeding but ultimately was unable to recover the fine the proceeding set.  *See id.* at 167.[3]  That, however, did not prevent the plaintiff from recovering its actual losses, the First Department explained.  *Id.* "Contempt," it explained, "was not intended to be in any way a substitute for the right to proceed by action, but was intended to be a concurrent remedy," *id.* (cleaned up), and because § 773

---

[3] Under § 773, as the First Department explained, "[a]: " fine fixed in an order adjudging one guilty of contempt may not be docketed as a judgment where, as here, the contemnor is serving a term in jail for failure to pay the fine."  *Id.*

made *the acceptance* of a fine a bar to recovering damages, the plaintiff, having not accepted the fine, was statutorily free to bring another cause of action for damages. *Id.* (noting that § 773 "provides that the payment and acceptance of a fine (referring to a fine in contempt proceedings) constitute a bar to an action by the aggrieved party to recover damages for loss or injury"). In other words, the statute permitting contempt sanctions, and even the pursuit of a contempt sanction, did not bar a plaintiff from pursuing money damages, provided the defendant had not accepted a contempt fine.

  *Riedel* does not assist Wimbledon, as it is readily distinguishable. The First Department in *Riedel* explicitly recognized that, under § 773, the payment and acceptance of a fine was a bar to an action for damages for the same wrong. Here, it is undisputed that BMK and Katzman have paid the fine the supreme court held warranted in the contempt proceeding. In its decision, that court considered Wimbledon's bid for an award of actual damages, but chose to award only actual losses from the contempt proceeding itself (attorneys' fees) as the fine. *See* Matteo Decl., Ex. 34 (quoting *Gottlieb v. Gottlieb*, 137 A.D.3d 614, 618, 28 N.Y.S.3d 37 (N.Y. App. Div. 2016) ("Legal fees that constitute actual loss or injury as a result of a contempt are routinely awarded as part of the fine." (cleaned up)). And the parties have stipulated that "On March 5, 2020, the BMK parties paid to Wimbledon the amount of $96,181.15 by wire transfer to Kaplan Rice LLP, in full satisfaction of the reasonable attorneys' fees and interest thereon." *See* Dkt. 97.

  Wimbledon has not cited any case—and this Court has found none—in which an action for damages was permitted to proceed after a contempt fine based on the same wrong had been both awarded and paid. *See Est. of Rothko*, 84 Misc. 2d 830, 870, 379 N.Y.S.2d 923, 963 (Sur. 1975), *decree modified sub nom. Will of Rothko*, 56 A.D.2d 499, 392 N.Y.S.2d 870 (N.Y. App. Div. 1977), *aff'd sub nom. Matter of Rothko's Est.*, 43 N.Y.2d 305, 372 N.E.2d 291 (1977)

("Judiciary Law § 773 specifically recognizes this by virtue of its provision that payment and

acceptance of a fine imposed as indemnity for a civil contempt constitutes a bar to an action by

the aggrieved party to recover damages for the loss or injury.  There can be no double

recovery."); *cf. Smith v. McIver*, 22 U.S. 532 (1824) ("Admitting, then, the concurrent

jurisdiction of the Courts of equity and law . . . we think the cause must be decided by the

tribunal which first obtains possession of it, and that each Court must respect the judgment or

decree of the other.").  The Court thus holds that Wimbledon is precluded from pursuing

negligence claims against BMK and Katzman based on their actions facilitating the $2.412

million transfer.

Although not necessary to the Court's ruling, the justice of this result is reinforced by an

aspect of Wimbledon's litigation before the supreme court:  In the same proceeding in which it

pursued contempt, Wimbledon also actually pursued damages for negligence.  It told the

supreme court that its negligence claim should be heard alongside its contempt motion, stating:

> While some courts have held that a claim for negligent violation of a restraining
> notice must be asserted in a separate action or special proceeding, Wimbledon is
> not "relegated to either a plenary action for damages or a motion . . . for contempt."
> *Mazzuka v. Bank of N. Am.*, 53 Misc. 2d 1053, 1056, 280 N.Y.S.2d 495 (Civ. Ct.
> 1967).  Rather the "form should give way to sound justice," and both requests for
> relief should be considered together, particularly where (as here) requiring
> Wimbledon to commence a new proceeding would waste judicial and party
> resources. *Id.* (citation omitted). *See also* CPLR § 103.

Hubell Decl., Ex. GG.  For reasons the record does not clarify, the supreme court did not rule on

Wimbledon's negligence theory (or refer to that theory in its ruling as to contempt damages).

Wimbledon did not challenge that lapse before the supreme court.  And when Wimbledon filed a

cross appeal of the contempt decision, seeking a greater damages award, it did not challenge the

supreme court's inaction on its claim of negligence. *See* Hubell Decl., Ex. JJ.  After the First

Department upheld the supreme court's ruling limiting contempt damages to reasonable

attorneys' fees, Wimbledon did not seek leave to further appeal that order. Dkt. 74 at 14. Under these circumstances, Wimbledon's renunciation of damages for negligence follows not merely under § 773 from its acceptance of the contempt fine awarded by the supreme court. It follows too under basic principles of *res judicata*—Wimbledon not only could have pursued a negligence claim, but it actually did, in the contempt proceeding, only to abandon it. *See Magassouba v. Cascione, Purcigliotti & Galluzzi, P.C.*, No. 20 Civ. 10996 (PAE) (BCM), 2021 WL 4198219, at *7 (S.D.N.Y. Sept. 15, 2021); *Aghaeepour v. N. Leasing Sys., Inc.*, 378 F. Supp. 3d 254, 265 (S.D.N.Y. 2019) (citing Restatement (Second) of Judgments § 24(2) (1982)) ("In other words, *res judicata* exists to ensure that litigants to do not get two bites at the apple and waste judicial resources relitigating issues that have or could have already been decided.").

The Court's holding under § 773 is in accord with the two § 773 cases Wimbledon cites. Each reinforces that a plaintiff may proceed by law, equity, or both. Neither supports that, after pursuing contempt sanctions and accepting payment of them, a party like Wimbledon can pursue negligence damages for the same wrong.

In *Mazzuka v. Bank of N. Am.*, 53 Misc. 2d 1053 (Civ. Ct. 1967), the plaintiff pursued a damages action based on a third-party bank's alleged violation of a restraining notice. The bank argued that plaintiff was limited to bringing a contempt proceeding, which he had not. The court upheld plaintiff's election as proper under *Riedel*: "Here, plaintiff elected not to proceed to punish the defendant for contempt as authorized by the underlying statutes, CPLR Sections 5222 and 5251, which are geared to the contempt machinery under the Judiciary Law, including 773 thereof. *Instead*, plaintiff chose to have recourse to an action for damages. That he has a right so to do is the holding of the *Riedel* case." *Id.* at 1057 (emphasis added).

Case 1:18-cv-08004-PAE    Document 102    Filed 08/02/22    Page 25 of 41

In *Kanbar v. Goldberg*, 1995 WL 17961038 (N.Y. Sup. Ct. Mar. 23, 1995), the court permitted the plaintiff to amend his complaint to include a claim for negligence after a contempt motion had been denied in an earlier proceeding. The court noted that the standard for contempt is a "refusal or *willful* neglect," a higher standard than negligence. *Id.* (citing N.Y. CPLR § 5251) (emphasis added)). In permitting to pursue a negligence claim in his later suit, the court noted that although "negligence, without more, is not enough to hold someone in contempt . . . , plaintiff is not trying to relitigate the contempt issue." *Id.* Here, of course, as to the $2.412 million transfer, Wimbledon seeks to do the opposite. The contempt proceeding was decided in its favor, which, as it itself argues, would collaterally estop BMK and Katzman from contesting their negligence with respect to that transfer. *See* Pl. Memo at 19–20 ("In holding Katzman and BMK in contempt for willfully neglecting the Restraining Notices, the supreme court therefore necessarily decided that their actions met the less demanding standard of negligence."). And, fatefully, Wimbledon made the choice to accept payment of the fine awarded by the supreme court for that contempt. That, under § 773, bars it from pursuing a damages action based on the same conduct.

Accordingly, as to Wimbledon's gross negligence and negligence claims arising from the $2.412 million transfer, the Court grants BMK and Katzman's summary judgment motion, and denies Wimbledon's summary judgment motion.

### 3. Does the Class TT Litigation Preclude Wimbledon's Claims as to the $5 Million Transfer?

Defendants make a different preclusion argument as to the $5 million transfer. As noted, to prevail, Wimbledon must establish, *inter alia*, that defendants' negligent conduct with respect to that transfer caused it actual damages. That means showing that, but for defendants' conduct, Wimbledon would have received all or some of the $5 million. Defendants argue that that issue

25

was decided in its favor in the Class TT litigation, barring Wimbledon from litigating it here. *See* Def. Mot. at 16.

That is wrong, because the Class TT decision does not resolve the causation issue here. In the Class TT litigation, which Wimbledon brought against Class TT to recover the $5 million payment, the New York supreme court held that Wimbledon was not entitled to set aside such payment to Class TT. Its basis was that Wimbledon did not have priority over Class TT's New York money judgment. *Id.* But the issue there was different. Acting after the $5 million had been disbursed to Class TT, the court there evaluated whether Wimbledon had priority over Class TT to that money; it held (and was affirmed on this ground) that Wimbledon did not. [4] But Wimbledon's claim here presupposes that BMK and Katzman abided by the Restraining Notice, such that the $5 million transfer to Class TT had not been made. The causation question in that scenario, as to Class TT, is whether it had priority over Wimbledon, such that the restrained funds would have gone to Class TT regardless. The Class TT litigation did not have occasion to resolve that issue. It was enough to resolve that litigation that Wimbledon lacked priority over Class TT, and thus did not have a basis to set aside the transfer. Critically, the Class TT litigation left open the possibility that these two creditors of Bergstein's had equal priority. In that scenario, Wimbledon would be at liberty to assert here, as to causation, that, but for defendants' breach of the Restraining Notice, it would have received some or all of the $5 million.

---

[4] *Wimbledon Fin. Master Fund*, 2018 WL 2163586, at *6–7 & n.17. In affirming, the First Department affirmed noted that "Katzman and BMK cite no authority in support of their contention that the California action has a superior interest in the settlement proceeds." *In re Wimbledon Fin. Master Fund*, 173 A.D.3d at 402.

Put in CPLR terms, Wimbledon's claim in the Class TT litigation was under CPLR §

5202(b), which governs priorities between a judgment creditor and a *subsequent transferee* of the

judgment debtor's property. It provides:

> Once a judgment creditor secures certain orders issued pursuant to article 52, such
> as a delivery order or an order directing an appointed receiver to take possession of
> specified property, the judgment creditor will obtain priority and prevail over any
> transferee except for one who does not know of the order and has paid fair
> consideration for the property.

*See Wimbledon Fin. Master Fund, Ltd. v. The Wimbledon Fund (Class TT)*, Index No.

651376/2019, 2019 WL 5547030, at *3 (N.Y. Sup. Ct. Oct. 28, 2019). The supreme court held

that Wimbledon had obtained only an "ordinary monetary judgment," *id.* at *4, not a turnover

order that would give it priority over Class TT as a "transferee," *id.* at *4 n.4. That

determination, however, does not resolve the disposition of the $5 million had Class TT not

benefitted from BMK and Katzman's breach of the restraining notice.

The Court accordingly denies BMK and Katzman's motion for summary judgment as to

the $5 million, to the extent that motion is based on collateral estoppel.

### B.    Cross-Motions for Summary Judgment as to the Elements of Negligence, With Respect to the $5 Million Transfer

Having found Wimbledon not precluded from pursuing damages claims as to the $5

million transfer, the Court turns to the cross-motions for summary judgment on that claim. For

the reasons that follow, the Court denies both parties' motions. That is because, although the

negligence elements of duty and breach can be resolved in Wimbledon's favor as a matter of

law, the issue of causation cannot be resolved, on the present record, in either party's favor on

summary judgment.

1.    **Negligence**

*a.  Applicable legal standards*

Under New York law, to prevail on a negligence claim, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825, 59 N.E.3d 485, 490 (2016) (quoting (*Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985)).

*b.  Duty and breach*

Defendants argue that, even after receiving the restraining notice, they did not owe a duty to Wimbledon to refrain from participating in disbursing the settlement funds to Class TT.  On the summary judgment record, that is clearly wrong.

"[T]o prevail on [a] claim of common-law negligence, there must first be a legal duty owed by defendant to" the plaintiff. *D'Amico v. Christie*, 71 N.Y.2d 76, 87, 518 N.E.2d 896 (1987).  "The definition and scope of an alleged tortfeasor's duty owed to a plaintiff is a question of law." *Pasternack*, 27 N.Y.3d at 825 (citing *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 611 N.Y.S.2d 817, 634 N.E.2d 189 (1994)).  Courts "fix the duty point by balancing factors, including the reasonable expectations of the parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001) (cleaned up).

The undisputed facts here easily establish a duty on BMK and Katzman's part—and running to Wimbledon's benefit—not to assist their client, Bergstein, in violating the Restraining Notices once they had actual notice of them.  Under CPLR § 5222, a "restraining notice is not a

28

mere notice but a form of process issued out of court intended to have the effect of injunction."
*Sumitomo Shoji N.Y., Inc. v. Chem. Bank of New York*, 47 Misc. 2d 741, 746 (Sup. Ct. N.Y.
Cnty. 1965), *aff'd*, 267 N.Y.S.2d 277 (N.Y. App. Div. 1966).  And under New York law, the
statutory duty owed to a judgment creditor to comply with a restraining notice is not limited to
the judgment debtor.  A third party "may be held liable to a judgment creditor for its negligence
in complying with a restraining notice."  *CSX Transp., Inc. v. Emjay Env't Recycling, Ltd.*, No.
12 Civ. 1865 (JS) (AKT), 2016 WL 755630, at *5 (E.D.N.Y. Feb. 25, 2016) (quoting *Mazzuka*,
53 Misc. 2d at 1057) (collecting cases), *aff'd in relevant part sub nom. CSX Transp., Inc. v.
Island Rail Terminal, Inc.*, 879 F.3d 462, 470–72 (2d Cir. 2018).  Apposite here, New York
courts have found that the duty extends to a lawyer who, with actual knowledge of a restraining
notice, assists their client in violating it.  *See, e.g., Kanbar v. Quad Cinema Corp.*, 195 A.D.2d
412, 414, 600 N.Y.S.2d 702, 704 (N.Y. App. Div. 1993) ("[A]n attorney whose refusal or willful
neglect of [a restraining notice] is responsible for his or her client's disobedience may also be
held in contempt").

In response, Katzman contends, factually, that no such duty attached to him because he
was not personally served with the Restraining Notice until April 5, 2018—long after both the
$2.412 and $5 million tranches had been disbursed to Class TT.  But on the record here, the
service is not decisive, as it is undisputed that Katzman had *actual notice* of the restraining
notices as of July 21, 2017, when they were emailed to him.  JSF ¶¶ 39–41; Wimbledon 56.1 ¶
11 (quoting Katzman admitting under oath that "upon receipt, I briefly glanced through the
Restraining Notices," but did not "review them or analyze them in depth").  Moreover, on
December 8, 2017, six days before he confirmed the wire instructions for the $5 million payment
to Class TT, Katzman was explicitly warned by letter that any disbursement of Bergstein's funds

violated Wimbledon's Restraining Notices. *See* Wimbledon 56.1 ¶¶ 29–30 (letter from Wimbledon stating that the distribution of the Enjoined Funds, "which post-dated service of Wimbledon's restraining notices by four weeks, was in violation of the restraining notices"). And on December 14, 2017, the day that he confirmed the wire transfer instructions, Katzman responded by letter to Wimbledon. The letter declined to provide further information regarding Bergstein's settlement with Class TT, but, salient here, it necessarily confirmed Katzman's receipt of Wimbledon's letter reminding him of his obligations under the restraining notices. *Id.* ¶ 32.

Moreover, in the contempt order she issued, supreme court Justice Kornreich rejected exactly the same argument by BMK Katzman, when made in connection with the earlier, $2.412 million transfer:

> Neither CPLR 5222(b) nor any case cited by the BMK Parties (and none found by this court) indicates that counsel of record in an action with actual knowledge of a restraining notice having been served upon its client is free to act as its client['s] agent and cause that restraining notice to be violated. The case law, in fact, is to the contrary. . . . There is no ambiguity here. *No reasonable attorney should expect that helping a client violate a restraining notice is acceptable.*

*Id.* 9–10 (collecting cases) (emphasis added). The Appellate Division affirmed, finding that, despite not having been formally served, Katzman had been "sufficiently aware" of the restraining notices to be held in contempt. *See In re Wimbledon Master Fund, Ltd.*, 173 A.D.3d at 401–02; *see also Darby v. Compagnie Nat'l Air France*, 96 N.Y.2d 343, 347, 753 N.E.2d 160, 162 (2001), *opinion after certified question answered sub nom. Darby v. Compagnie Nat. Air France*, 13 F. App'x 37 (2d Cir. 2001) (summary order) ("[I]t is for the courts first to determine whether any duty exists . . . . In so doing, courts identify what people may reasonably expect of one another. In assessing the scope and consequences of civil responsibility, they define the boundaries of 'duty' to comport with what is socially, culturally and economically acceptable."

(citations omitted)); *Ivor B. Clark Co. v. Hogan*, 296 F. Supp. 407, 412 (S.D.N.Y. 1969) (third-party's claim that "it did not receive a restraining notice but rather a notice that restraining orders had been served upon the judgment debtors herein is of no particular significance in that a person not served with a restraining notice can be punished for contempt if he, with knowledge of the existence and the terms of a restraining notice served on another, wilfully participates in a violation thereof.").

The element of breach can also be resolved in Wimbledon's favor on summary judgment. There is no factual dispute as to defendants' role in causing the disbursal of the restrained $5 million to Class TT, in violation of the restraining notices. On December 8, 2018, Wimbledon's counsel had informed Katzman that the transfer of the $2.412 million of restrained funds to Class TT had violated the notices. Six days later, Katzman, rather than acting to stop the imminent transfer of $5 million, facilitated that transfer by reaching out to Class TT's counsel to confirm wire transfer instructions. *See* Wimbledon 56.1 ¶ 34 ("Our client is planning on making the 5 mm payment per the settlement agreement. Are the wire instructions you provided to us for the funds held per the preliminary injunction, attached, the ones we should use? If not, please provide different wire instructions.").[5]

### c. Causation

The element of causation as to the $5 million transfer, however, cannot be resolved on the present record, requiring denial of both parties' cross-motions.

---

[5] Katzman also inhibited Wimbledon from learning about Bergstein's $5 million until it had been disbursed to Class TT. On December 8, 2017—in the same letter notifying Katzman that a disbursal of Bergstein's funds to other creditors would violate the Restraining Notices—Wimbledon's counsel asked Katzman to provide a copy of the settlement agreement between Bergstein and Class TT. *Id.* ¶ 31. On December 14, 2017—the same day he confirmed the wire instructions—Katzman refused to provide it, claiming that the document was privileged. *Id.* ¶ 32.

Wimbledon argues that "[h]ad Katzman and BMK not helped Bergstein and Graybox violate the Restraining Notices, the funds transferred to Class TT would have been available to satisfy Wimbledon's Turnover Judgment against Bergstein and Graybox." *See* Dkt. 68 ("Pl. Memo") at 23. Defendants counter by noting that Wimbledon lacked priority over Class TT to the funds, and arguing that, assuming the two creditors had equal priority, it is speculative to assume that Wimbledon was destined to receive the $5 million.

Under New York law, "the plaintiff has the burden of proving each element of their negligence claim, including causation." *Hackl Enters. Inc. v. Dresser Rand Co*., No. 96 Civ. 127, 2004 WL 1745788, at *1 (W.D.N.Y. Aug. 3, 2004). "Causation incorporates at least two separate but related concepts: cause-in-fact and proximate cause. Cause-in-fact refers to those antecedent events, acts or omissions, which have so far contributed to the result that without them it would not have occurred. . . . . Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct." *Aegis Ins. Servs. Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (citation omitted). The "bedrock principle of tort law [is] that for there to be a recovery for an injury, it must be established that defendant's act was a cause-in-fact of an injury." *Id.* at 179. A defendant's conduct is "not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct." *Id.* In addition, "mere speculation regarding causation is inadequate to sustain [the] cause of action." *Segretti v. Shorenstein Co., E. L.P.*, 256 A.D.2d 234, 235, 682 N.Y.S.2d 176 (N.Y. App. Div. 1998); *see also Lynn v. Lynn*, 216 A.D.2d 194, 195, 628 N.Y.S.2d 667 (N.Y. App. Div. 1995).

The causation analysis here turns on the legal character of the restraint on Bergstein's money here. Wimbledon's judgment against Bergstein and Graybox, as defendants rightly note,

was a money judgment only. *See Wimbledon Fin. Master Fund*, 2019 WL 5547030, at *4

("There can be no dispute that the July 2017 Judgment is solely a monetary judgment and was

affirmed as such by the Appellate Division." (citation omitted)). The judgment did not give

Wimbledon priority over other creditors of Bergstein's. Accordingly, the restraining notice

issued pursuant to that judgment did not create a lien or give Wimbledon a special priority,

either. It "prevented [defendants] from transferring funds but gave [Wimbledon] no priority as

to the distribution of the funds." *Midlantic Nat. Bank/N. v. Fed. Rsrv. Bank of N.Y.*, 814 F. Supp.

1195, 1197 (S.D.N.Y. 1993) (citing *Aspen Indus. v. Marine Midland Bank*, 52 N.Y.2d 575, 439

N.Y.S.2d 316 (1981)). For Wimbledon's judgment to attain priority, it would have had to take

additional steps, such as securing a turnover order, or an execution levy. *See Aspen Indus.*, 52

N.Y.2d at 580. It is undisputed that, as the supreme court found as to the $5 million, Wimbledon

did not take such steps, or secure any such priority, here.

Where a violation of a restraining notice based on a monetary judgment is at issue, the

Second Circuit has instructed, "damages cannot be assessed without delineating the relative

priority of [all relevant] judgment creditors." *CSX Transp.*, 879 F.3d at 474 (district court

abused its discretion when it failed to assess damages "in light of the priority of [the debtor's]

various creditors pursuant to C.P.L.R. § 5234—because if other creditors had superior claims to

the restrained funds before Garnishees violated the Restraining Notices, then CSX did not suffer

damages."). In other words, the mere availability of funds, although a necessary showing, *see*

*Aspen Indus.*, 52 N.Y.2d at 581, is not sufficient. The creditor must also demonstrate that her

placement in line relative to other creditors entitled her to the sum she seeks.

Applying these principles here, summary judgment cannot be granted on this element as

to either defendants or Wimbledon, because, on the record at hand, it cannot be determined with

certainty whether, and to what extent, Wimbledon would have secured the $5 million from the Bergstein had Katzman and BMK not unlawfully facilitated its exit from Bergstein's account. The two sides can posit versions of events that could have transpired under which Wimbledon either would have received, or would have been denied, in whole or part, the $5 million.

Defendants note that Bergstein's account holding the $5 million itself was not restrained. The restraint ran instead to Bergstein and agents of his (like BMK and Katzman) with notice of the Restraining Notices. Defendants can accordingly posit that, even had BMK and Katzman not facilitated the transfer of the $5 million, various events might have resulted in the lawful release of the $5 million to Class TT, or perhaps the release of some of it to another Bergstein creditor. Defendants can note, too, that Wimbledon did not then know of the $5 million and might not have discovered it for some time. Finally, defendants can note, it is possible that, in time, Class TT could have converted its settlement into a judgment, and therefore attained priority for it via a turnover order or execution levy.

Wimbledon, for its part, notes that, once it learned of the Class TT settlement at the December 5, 2017 hearing, it was demonstrably in motion, seeking to discover the terms of that settlement and the scope and location of Bergstein's assets. Through discovery, it can argue, it would have secured that information in due course, and taken further steps to restrain the release of the $5 million to Class TT. Wimbledon can note, too, that it had the capacity to attain priority for its judgment. It can argue that it was better positioned to do so more expeditiously than Class TT, whose settlement had been converted into a court judgment, and thereafter to pursue an order releasing those funds to its benefit.

There is, finally, a scenario unaddressed by either party: the one in which the funds remained in Bergstein's account because Bergstein and his agents abided by the Restraining

Notices; and the competing claims by Wimbledon and Class TT (and perhaps others) to the $5 million eventually came before a court of competent jurisdiction, with neither creditor having priority over the other.  The parties have not addressed, how, in those circumstances, Bergstein's funds would have been allocated, including whether the allocation of debtor Bergstein's limited funds among his creditors might have become the province of a bankruptcy proceeding.

In these circumstances, the element of causation cannot be resolved on summary judgment.[6]

### 2.    Gross Negligence

The parties also cross-move on Wimbledon's claim for gross negligence as to the $5 million transfer.

#### a.    *Applicable legal standards*

Gross negligence is "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quotation omitted).  To constitute gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care." *Curley v. AMR Corp., et al.*, 153 F.3d 5, 13 (2d Cir. 1998) (quoting 79 N.Y. Jur. 2d Negligence § 37 (1989)).  To establish a *prima facie* claim of gross negligence, a plaintiff "must prove by a fair preponderance of the credible evidence" that the defendant "not only acted carelessly in making

---

[6] The Court recognizes the unusual nature of the causation issue here, which appears to turn on competing projections about how events would have played out but for defendants' breach of the restraining notices.  Because this issue—and the need for attention to priority among debtors— was only thinly addressed by the summary judgment briefs, the Court will, by separate order, invite the parties to confer and submit a joint letter as to the manner in which this issue is to be litigated.  *Cf. CSX Transp.*, 879 F.3d at 474 (hearing on damages necessary where record left a "lack of clarity as to the order of or priority of judgment creditors").

a mistake, but that it was so extremely careless that it was equivalent to recklessness." *Hong Kong Export Credit Ins. Corp. v. Dun & Bradstreet*, 414 F. Supp. 153, 160 (S.D.N.Y. 1975).

Under New York law, a mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence. *Am. Tel.*, 83 F.3d at 549 (citing *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 555, 583 N.Y.S.2d 957, 963–64, 593 N.E.2d 1365, 1371–72 (1992)). "The issue of gross negligence is ordinarily a question of fact for a jury to determine." *Charter Oak Fire Ins. Co. v. Trio Realty Co.*, No. 99 Civ. 10827 (LAP), 2002 WL 123506, at *5 (S.D.N.Y. Jan. 31, 2002) (citing *Travelers Indem. Co. v. Losco Grp., Inc.*, 136 F. Supp. 2d 253, 256 (S.D.N.Y. 2001) (other citations omitted)).

### b. Application

Defendants do not contest defendants' gross negligence as applied to Katzman's enabling the $5 million transfer from Bergstein's account. Nor could they, in light of Wimbledon's counsel's having explicitly notified Katzman that any transfer from Bergstein to a third party would violate the restraining notices. *See* Dkt. 74 ("Def. Oppo. Memo") at 22–23 (addressing only $2.412 million transfer); Dkt. 85 ("Def. Reply Memo") at 11–12.[7]

Defendants instead make the same arguments as on the negligence claim—that Katzman and BMK did not have (and thus could not have breached) a duty to Wimbledon because they

---

[7] Notwithstanding defendants' decision not to contest this issue, the Court has independently reviewed the evidence on this pointe, as is necessary even when a summary judgment motion is unopposed. *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006). There is ample evidence of Katzman's reckless disregard for Wimbledon's rights with respect to the $5 million transfer. This includes that Katzman received actual notice of the restraining notice via email on July 21, 2017, *see* JSF ¶ 40; Wimbledon 56.1 ¶ 11, and later was notified in explicit terms by Wimbledon's counsel—after counsel had learned of the $2.412 million transfer—that a further transfer on behalf of Bergstein would again be "in violation of its restraining notices." Wimbledon 56.1 ¶ 30. Nevertheless, Katzman—on the same day, December 14, 2017, that he refused Wimbledon's request for information about the Class TT settlement—facilitated the $5 million transfer by confirming wire instructions with Class TT's counsel. *Id.* ¶¶ 34–35; JSF ¶ 61.

"never represented Wimbledon," Def. Reply Memo at 11–12, and that causation has not been established.

The Court's resolution of these arguments above, in connection with Wimbledon's negligence claim, equally applies to the gross negligence claim.  As to duty, as Justice Kornreich and the First Department each held, BMK and Katzman had a duty not to aid their client's violation of restraining notices.  As to breach, defendants breached this duty by facilitating the $5 million transfer to Class TT.  As to whether defendants' breach caused Wimbledon actual damages, however, summary judgment cannot be granted.

The Court accordingly denies the cross-motions for summary judgment on Wimbledon's gross negligence claim.

### 3.    The California Litigation Privilege

In seeking summary judgment, defendants make a final argument, independent of the quality and quantity of evidence as to Wimbledon's claims.  They argue that their conduct was protected by the California litigation privilege.  Wimbledon counters that California law does not apply here, and that even if it did, the privilege would not shelter defendants' conduct.

#### a.   Choice of law

The threshold question is whether, as defendants urge, California substantive law, and its litigation privilege, apply, or whether, as Wimbledon urges, its claims are governed solely by New York law.

##### i.      Applicable legal standards

First, the Court must determine whether New York and California law conflict, thereby requiring a determination as to whose law applies.  *See Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict

between the laws of the jurisdictions involved."). There is a clear and actual conflict, because California's litigation privilege is much broader than its New York analogue.

The litigation privilege codified by California Civil Code § 47(b) is broad. It "generally protects from tort liability any publication made in connection with a judicial proceeding" and shields communicative statements that have "some relation" to a lawsuit, including settlement negotiations. *Rubin v. Green*, 4 Cal. 4th 1187, 1193–94 (1993); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1132–33 (1990). "The privilege is 'an "absolute" privilege, and it *bars all tort causes of action except a claim of malicious prosecution.*'" *Kenne v. Stennis*, 230 Cal. App. 4th 953, 965 (2014) (quoting (*Hagberg v. Calif. Fed. Bank*, 32 Cal. 4th 350, 360 (2004) (emphasis added in *Kenne*)).

By contrast, the New York litigation privilege applies only in the context of "defamation, slander, and libel actions." *Michelo v. Nat'l Collegiate Student Loan Trust 2007-2*, 18 Civ. 1781 (PGG), 18 Civ. 7692 (PGG), 2019 WL 5103885, at *12 (S.D.N.Y. Oct. 11, 2019). Thus, were New York law to apply, the litigation privilege would be inapplicable, "because [Wimbledon] ha[s] not claimed defamation." *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010).

In determining which state's law applies in the context of tort cases, New York applies the "most significant interest test," which distinguishes between "conduct regulating" and "loss allocating" rules. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). "A judicial-proceeding privilege is conduct-regulating." *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992). Where conduct-regulating rules conflict, New York looks to the "jurisdiction [that] has the greatest interest in regulating behavior within its borders"—usually the state where the tort occurred. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).

38

Under the circumstances of this case, New York has a far greater interest than does California in the privilege law to be applied. Katzman's tortious conduct, as alleged here, was centered in New York. Wimbledon's claims arise from his participation in helping his and BMK's client avoid restraining notices to enforce a judgment entered by a New York court in a New York action, in a New York court to which Katzman had been admitted *pro hac vice*. And a New York court has already found that Katzman and BMK acted in contempt when they facilitated one of those transfers. New York has an obvious, substantial interest in ensuring that its orders and judgments are not subverted by attorneys to whom it has extended the privilege of practicing in its courts. *See Block v. First Blood Assocs.*, 691 F. Supp. 685, 698 (S.D.N.Y. 1988) (applying New York privilege law because "New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York" even though the alleged tortious conduct occurred in the course of California proceedings). Moreover, the events giving rise to Wimbledon's claims largely occurred in New York. The settlement agreement between Class TT and Bergstein was negotiated, reached, and executed during a settlement conference in New York City. JSF ¶ 43. Katzman participated in that conference in person. *Id.* Indeed, a California federal court recognized in denying BMK's motion to enjoin Wimbledon from pursuing claims in this action: "this is a New York-centric dispute." *See* Matteo Opp. Decl., Ex. 2 at 5.

The Court, accordingly, holds that New York law applies.

### ii. Application

Defendant's conduct is not immunized by any litigation privilege, for two reasons.

First, as reviewed above, New York's litigation privilege does not protect against the claims here, which are for negligence and gross negligence, and not for defamation. *See Conti v.*

*Doe*, 535 F. Supp. 3d 257, 281 (S.D.N.Y. 2021) (collecting cases in which New York litigation privilege did not apply outside of defamation context).

Second, even assuming *arguendo* that California law did apply, the California litigation privilege would not extend to the tortious conduct here—facilitating a transfer of a client's funds in violation of a restraining notice—because is non-communicative.

"Because the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative." *Jacob B. v. Cnty. of Shasta*, 40 Cal. 4th 948, 957 (2007) (citing *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1058 (2006)). The distinction between communicative and noncommunicative conduct turns on the gravamen of the action. *See Rubin*, 4 Cal. 4th at 1195; *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1132, n. 12. "[I]f the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct. . . . Stated another way, unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action, the litigation privilege applies." *Jacob B.*, 40 Cal. 4th at 957, (citing *Rusheen,* 37 Cal. 4th at 1065).

Here, Wimbledon claims injury not from any statement or publication made in relation to the Class TT settlement, but from defendants' actions in disbursing client funds in violation of its restraining notices. *See Kimmel v. Goland*, 51 Cal. 3d 202, 212 (1990); *see also Susan S. v. Israels*, 55 Cal. App. 4th 1290, 1299 (1997). And contrary to defendants' portrayal, Wimbledon does not challenge the Bergstein/Class TT settlement agreement. It challenges the transfer of

funds to effectuate that agreement to the extent these transfers were in knowing violation of its restraining notices..[8]

## CONCLUSION

For the foregoing reasons, the Court (1) grants defendants' motion for summary judgment as to Wimbledon's negligence and gross negligence claims arising from Bergstein's $2.412 million payment to Class TT, and denies plaintiffs' motion for summary judgment as to this payment; and (2) denies both parties' motions for summary judgment as to Wimbledon's claims of negligence and gross negligence arising from Bergstein's $5 million payment to Class TT.

By separate order, the Court will commission from the parties a joint letter with their views as to next steps, in particular, as to the causation element

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 2, 2022
      New York, New York

---

[8] Defendants' portrayal of the case as turning on communications—*i.e.*., the negotiation and execution of the Class TT settlement agreement—as opposed to the facilitation of a financial transaction is also in conflict with defendants' theory that the California litigation applies. These communications occurred in New York.