UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WIMBLEDON FINANCING MASTER FUND LTD.,

                                    Plaintiff,

                -v-

BIENERT MILLER & KATZMAN, PLC *and* STEVEN J.
KATZMAN,

                                    Defendants.

---

18 Civ. 8004 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case arises from competing claims by creditors to recover money from a convicted fraudster, David Bergstein ("Bergstein"). Plaintiff Wimbledon Financing Master Fund Ltd. ("Wimbledon"), a creditor of Bergstein's, obtained an $8,497,578.75 money judgment against Bergstein and others. After Wimbledon had served a restraining notice on Bergstein, but before it took other steps to secure its priority, Bergstein, through his lawyer Steven J. Katzman ("Katzman"), negotiated a settlement agreement with a different Bergstein creditor, The Wimbledon Fund, SPC ("Class TT"). Katzman then facilitated two sequential wire transfers from Bergstein to Class TT to satisfy the settlement agreement, one for $2.412 million and the next for $5 million. As pled, these transfers left Bergstein without funds to pay the judgment against Wimbledon.

Wimbledon initially sought relief in New York state court against Katzman, his law firm, Bienert Miller & Katzman PLC ("BMK"), and Bergstein. Wimbledon, not knowing then of the second wire transfer, moved for contempt against them based on the first of the wire transfers to

Class TT.  The action resulted in a finding of contempt against Katzman, BMK, and Bergstein, with the state court requiring Katzman and BMK to pay Wimbledon's attorneys' fees and associated costs.  The state court declined to order Katzman and BMK to pay to Wimbledon the $2.412 million diverted in violation of the restraining notice, finding such a remedy excessive.

Wimbledon then sought relief against Katzman and BMK (together, "defendants") in this Court, claiming negligence and gross negligence as to the $2.412 million and $5 million transfers.  Following the parties' first round of cross-motions for summary judgment, the Court (1) granted defendants' motion for summary judgment as to the claims arising from the $2.412 million transfer, on the grounds that the state court action precluded those claims, and (2) denied summary judgment as to the claims arising from the $5 million transfer.  Dkt. 102 ("MSJ Opinion") at 23, 27.  With respect to the latter, the Court found that the material facts established that defendants had owed to Wimbledon a duty to refrain from assisting their client, Bergstein, in violating the restraining notice and that their participation in the transfer of $5 million to Class TT breached that duty.  *Id.* at 28–31.  Noting the thinness of the parties' briefing on the causation element of the negligence claims, the Court was unable to resolve the summary judgment motions on that element.  *Id.* at 33–35, 35 n.6.

Accordingly, the Court commissioned the currently pending summary judgment motions, directed to the causation element, and held argument on that point.  For the following reasons, the Court finds in favor of Wimbledon on the causation element of its negligence and gross negligence claims as to the $5 million transfer, and resolves that element of the pending cross-motions accordingly.  (The Court also denies as moot Wimbledon's motion to strike certain arguments in defendants' reply brief.)  This decision leaves unresolved the question of damages. The Court directs the parties, in accordance with this opinion, to conduct limited discovery

2

regarding intervening events that may implicate the quantity of Wimbledon's damages.  Upon

conclusion of such discovery, the Court will put in place a briefing schedule as to damages.

## I.      Background

### A.      Factual Background[1]

The Court incorporates by reference the account of the underlying facts of this case

included in the first summary judgment decision, *see id.* at 2–16, and includes here only those

facts necessary to explain its decision on the pending motions.

#### 1.      Parties and Relevant Non-Parties

Plaintiff Wimbledon is an exempted liability company organized under Cayman Islands

law.  JSF ¶ 1.  Non-party Class TT is a Cayman Islands segregated portfolio company, *id.* ¶ 9,

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the first round of summary judgment motions—specifically, the parties' Joint Statement of Undisputed Facts, Dkt. 66 ("JSF"); Wimbledon's Local Rule 56.1 statement of material facts, Dkt. 70 ("Wimbledon 56.1"); the declaration of Joseph A. Matteo in support of Wimbledon's motion, Dkt. 71 ("Matteo Decl."), and exhibits attached thereto; defendants' Local Rule 56.1 counter-statement and additional statement of material facts, Dkt. 74, Ex. 1 ("Def. 56.1"); the declaration of Richard A. Hubell in support of defendants' motion, and exhibits attached thereto, Dkt. 72 ("Hubell Decl."); Wimbledon's Local Rule 56.1 counter-statement and additional statement of material facts, Dkt. 83 ("Wimbledon Reply 56.1"); the declaration of Joseph A. Matteo in opposition to defendants' motion, Dkt. 82 ("Matteo Opp. Decl."); and defendants' Local Rule 56.1 counter-statement to Wimbledon's statement of additional material facts, Dkt. 86 ("Def. Reply 56.1").

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

and non-party Weston Capital Partners Master Fund II, Ltd. ("Partners II") is an investment fund organized under Cayman Islands law, *id.* ¶ 8.

Wimbledon, Class TT, and Partners II were victims of a fraud perpetrated by Bergstein, who is not a defendant in this suit.  On March 1, 2018, a jury in this District found Bergstein guilty of seven counts of securities fraud, investment advisor fraud, wire fraud, and conspiracy to commit those offenses against Wimbledon, Class TT, and Partners II.  *Id.* ¶ 64.  On September 26, 2018, Judge Castel ordered Bergstein to forfeit approximately $22.6 million and pay restitution of approximately $15.2 million.  *United States v. Bergstein*, No. 16 Cr. 746 (PKC), Dkts. 464–65.  Among the victims listed in the restitution order is Wimbledon, which is stated to be owed $5.9 million.  *United States v. Bergstein*, No. 16 Cr. 746 (PKC), Dkt. 465.  On September 16, 2019, the Second Circuit affirmed the judgment and orders of restitution and forfeiture.  *United States v. Bergstein*, No. 16 Cr. 746 (PKC), Dkt. 503.  Bergstein is currently incarcerated in California.  JSF ¶ 6.

Defendant BMK was a California professional legal corporation with an office located in San Clemente, California.  *Id.* ¶ 3.  Defendant Katzman was a BMK shareholder.  *Id.* ¶ 4.  BMK and Katzman represented Bergstein and non-party Graybox LLC ("Graybox"), a limited liability company, in various civil suits.  *Id.* ¶¶ 7, 25, 32.  Bergstein is the sole owner and officer of Graybox.  Wimbledon 56.1 ¶ 1.

### 2.    Events Leading to Wimbledon's Claim to Bergstein's Funds

Wimbledon's claims against Bergstein arise from its efforts to enforce a judgment assigned to it by Partners II.  JSF ¶¶ 11, 19, 28.  On January 22, 2016, Wimbledon commenced a special proceeding in the commercial division of New York State Supreme Court in Manhattan, captioned *Wimbledon Financing Master Fund, Ltd. v. David Bergstein et al.*, No. 150584/2016, against Bergstein, Graybox, and others, to enforce the Arius Libra judgment (the "State Court

Proceeding"). *Id.* ¶ 22. Bergstein and Graybox's counsel at Sills Cummis & Gross, P.C. ("Sills Cummis"), moved to admit Katzman *pro hac vice* in the State Court Proceeding on behalf of Bergstein and Graybox. *Id.* ¶ 32. On July 17, 2017, the state supreme court granted summary judgment in Wimbledon's favor. *See id.* ¶ 35. Shortly thereafter, on July 21, 2017, the court entered an approximately $8.5 million money judgment in Wimbledon's favor against Bergstein individually, for approximately $1.1 million with prejudgment interest, and against Bergstein jointly and severally with various entities including Graybox, for approximately $7.4 million with prejudgment interest (the "Wimbledon Judgment"). *Id.* ¶ 36. On November 20, 2018, that judgment was affirmed. *See Wimbledon Financing Master Fund, Ltd. v. Bergstein*, 166 A.D.3d 496, 90 N.Y.S.3d 12 (N.Y. App. Div. 1st Dep't 2018); JSF ¶ 76.

### 3. Events Leading to Class TT's Claim to Bergstein's Funds

Class TT's claims against Bergstein arise out of a note purchase agreement it entered with Swartz IP Services Group, Inc. ("SIP"), an entity founded by Bergstein. *See* Hubell Decl., Exs. I, Q at 2. After breach of that agreement, Class TT filed three separate lawsuits: (1) a suit against SIP in New York State Supreme Court, for breach of contract, *see Wimbledon Fund, SPC v. Advisory IP Servs. Inc.*, Index No. 650446/2013; JSF ¶ 10, 21; Hubell Decl., Ex. L; (2) an action for a judicial declaration in the Southern District of Texas, to hold SIP's directors and officers, including Bergstein, jointly and severally liable for its judgment against SIP, *see* JSF ¶ 13; and (3) an action for monetary and injunctive relief in the Central District of California, to recover its investments in SIP from allegedly fraudulent transferees, including Graybox, which was alleged to have received $2.412 million in fraudulent transfers of Class TT's investments in SIP, JSF ¶ 14; Hubell Decl., Ex. P.

On November 24, 2015, Class TT obtained in the New York state court action a judgment against SIP in the amount of approximately $23.1 million. *See* JSF ¶ 21; Hubell Decl.,

Ex. M.  On April 1, 2016, the two federal cases were consolidated in the Central District of

California (the "California Federal Action").  JSF ¶ 24.  On January 17, 2017, the federal action

was stayed pending resolution of Bergstein's criminal case.  *Id.* ¶ 34.

### 4.    The Restraining Notices and Class TT Settlement Agreement

On July 21, 2017—the day that the Wimbledon Judgment of $8.5 million was entered in

the State Court Proceeding—Wimbledon's counsel served restraining notices on Bergstein and

Graybox via certified mail, return receipt requested, pursuant to New York Civil Practice Law

and Rules ("C.P.L.R.") § 5222 (the "Restraining Notices").  *Id.* ¶ 37.  Each Restraining Notice

stated that Bergstein and Graybox were "hereby forbidden to make or suffer any sale,

assignment, transfer, or interference with any property in which You have an interest, except

upon direction of the sheriff or pursuant to an order of the court, until the Judgment is satisfied or

vacated," and that "disobedience of this Restraining Notice is punishable as contempt of court."

Wimbledon 56.1 ¶¶ 8–9.  The same day, Wimbledon's counsel emailed the Restraining Notices

to attorneys at Sills Cummis, one of whom forwarded them to Katzman.  JSF ¶¶ 38–39.

Katzman has admitted under oath that, "upon receipt, I briefly glanced through the Restraining

Notices," but, he has claimed, he "did not review them or analyze them in depth."  Wimbledon

56.1 ¶ 11.

On August 10, 2017—three weeks after receiving the Restraining Notices—Katzman and

Bergstein participated in person in a meeting with representatives of Class TT to negotiate the

terms of a settlement of Class TT's claims against Bergstein and Graybox (the "Class TT

Settlement Agreement").  JSF ¶ 43.  At that meeting, Graybox, Bergstein, and Class TT executed

a settlement term sheet that provided for a $9.4 million settlement payment to Class TT, payable

in three installments: first, the "immediate[]" payment of $2.412 million belonging to Graybox,

the transfer of which had been enjoined in the California Federal Action; second, within 30 days

of execution of the Class TT Settlement Agreement, the payment of $5 million by SIP; and third, within 12 months of the execution of the Class TT Settlement Agreement, the payment of $2 million by SIP.  Wimbledon 56.1 ¶¶ 13–14.

On August 16, 2017, BMK filed a joint stipulation in the California Federal Action, advising the court of the parties' confidential settlement and requesting an order directing BMK to deliver the enjoined Graybox funds to Class TT.  JSF ¶ 47.  Katzman, BMK, Bergstein, and Graybox did not inform the California district court that the Wimbledon Judgment had been entered against Bergstein and Graybox or that Bergstein and Graybox had received and were subject to the Restraining Notices.  Wimbledon 56.1 ¶¶ 17–18.  Nor did Katzman, BMK, Bergstein, and Graybox seek permission from the New York State Supreme Court to release the enjoined funds, or inform Wimbledon of the application to the California district court to transfer the enjoined funds to Class TT.  *Id.* ¶¶ 19–20.

On August 17, 2017, the California district court approved the joint stipulation and lifted the stay of the case in order to allow BMK to release the $2.412 million in enjoined funds.  JSF ¶¶ 49–51.  On August 21, 2017, BMK transferred the formerly enjoined funds to Class TT.  *Id.* ¶ 52.  Between November 16 and 21, 2017, Graybox, Bergstein and Class TT executed the Class TT Settlement Agreement.  *Id.* ¶ 53.

## 5. Wimbledon's Contempt Motion Based on the $2.412 Million Transfer

During a December 5, 2017 hearing on Sills Cummis's motion to withdraw as counsel to Bergstein and Graybox in the State Court Proceeding, Wimbledon's counsel stated that Wimbledon had just learned of the transfer of the $2.412 million in Graybox funds previously enjoined by the California district court.  Wimbledon 56.1 ¶ 26; Matteo Decl., Ex. 15 at 24.  The Sills Cummis attorneys stated that they had not known of the transfer before learning about it from Wimbledon's counsel.  Wimbledon 56.1 ¶ 27; Matteo Decl., Ex. 15 at 25.

Through a letter dated December 8, 2017, Wimbledon's counsel informed Katzman that "[it] recently became aware that, notwithstanding the restraining notices, the $2,412,000 belonging to Bergstein and Graybox was distributed to the TT Fund." Wimbledon 56.1 ¶ 29; Matteo Decl., Ex. 17 at 2. Wimbledon requested that Katzman (1) provide BMK's communications concerning the Wimbledon Judgment and Restraining Notices; (2) produce the Class TT Settlement Agreement; and (3) explain the circumstances of the distribution to Class TT. Wimbledon 56.1 ¶ 31; Matteo Decl., Ex. 17 at 2. By letter dated December 14, 2017, Katzman refused these demands. Wimbledon 56.1 ¶ 32; Matteo Decl., Ex. 18.

The Class TT Settlement Agreement was fully executed on November 21, 2017, and, accordingly, per the terms of the agreement, the second, $5 million payment was due by December 21, 2017. Wimbledon 56.1 ¶ 33; Matteo Decl. Ex. 19 at 4. On December 19, 2017, Xanadu Media Group, Inc. ("Xanadu") wired $5 million to the client trust account of Class TT's lawyer. *See* JSF ¶ 61. Although defendants denied knowledge or involvement in the $5 million payment, *see* Def. 56.1 ¶ 109, Katzman, in the week before the transfer, sent and received emails that discussed the payment. *See* Wimbledon 56.1 ¶¶ 34–35; Matteo Decl., Exs. 20–21.

On February 5, 2018, after Katzman did not respond to Wimbledon's follow-up request for information about the $2.412 million transfer to Class TT, *see* Wimbledon 56.1 ¶¶ 36–37, Wimbledon moved in New York State Supreme Court for an order of civil contempt against Bergstein, Graybox, Katzman, and BMK based on the transfer of the $2.412 million to Class TT, JSF ¶ 63. On May 10, 2018, the supreme court held Bergstein, Graybox, Katzman, and BMK in civil contempt for transferring the $2.412 million to Class TT, finding that "[t]here is no question of fact that the Bergstein Parties knowingly and willfully violated the Restraining Notices" and ordering them to pay reasonable attorneys' fees expended in connection with the motion. Matteo

Decl., Ex. 34; *see also* Wimbledon 56.1 ¶ 58.  As to actual damages, the court found that while

"a party held in contempt for violating a restraining notice may be ordered to pay the full amount

of money that would have been available to satisfy the judgment but for its contempt," holding

Katzman liable for the full $2.412 million would be "far too harsh."  Matteo Decl., Ex. 34

(internal quotations omitted).  The court explained that "[t]his public admonishment, placing

restrictions on his future *pro hac vice* applications, and compelling him to pay Wimbledon's

attorneys' fees, is punishment enough."  *Id.*

On June 4, 2019, the New York Appellate Division, First Department, affirmed in part

and modified in part the supreme court's contempt decision.  *See Wimbledon Financing Master*

*Fund, Ltd. v. Bergstein, et al.*, 173 A.D.3d 401, 103 N.Y.S.3d 378 (N.Y. App. Div. 2019); JSF

¶ 77.  On October 3, 2019, the Appellate Division denied Katzman and BMK's motion to

reargue their challenge to Wimbledon's motion for civil contempt or, in the alternative, for leave

to appeal the contempt decision to the New York Court of Appeals.  JSF ¶ 81.

### 6.    Wimbledon's Litigation Against Class TT Based on the $5 Million Transfer

Wimbledon did not learn of the second, $5 million transfer pursuant to the Class TT

Settlement Agreement until after it moved for contempt against Bergstein, Graybox, Katzman,

and BMK.  *See* Dkt. 99 at 40; Hubell Decl., Ex. LL.  On March 7, 2019, Wimbledon sued Class

TT in New York State Supreme Court in Manhattan, seeking to set aside the $5 million

conveyance to Class TT.  *See* Hubell Decl., Ex. LL; *Wimbledon Fin. Master Fund, Ltd. v. The*

*Wimbledon Fund, SPC (Class TT)*, Index No. 651376/2019.

On October 28, 2019, the supreme court granted Class TT's motion to dismiss

Wimbledon's suit.  JSF ¶ 81.  It held that C.P.L.R. § 5202(b), the "only basis" for Wimbledon's

petition, did not permit the relief sought.  Hubell Decl., Ex. MM at 8.  Section 5202(b), the court

stated, "gives judgment creditors who have obtained a turnover order priority over subsequent creditors and permits the imposition of liability on subsequent creditors who receive assets of the judgment debtor in bad faith and while on notice of the other creditor's priority." *Id.* at 2.  But, it noted, Wimbledon's judgment against Bergstein and his confederates was a monetary judgment, and did not direct delivery, turnover, or any other article 52 relief within the meaning of C.P.L.R. § 5202(b).  *Id.* at 8–9.  As such, the court held, the Wimbledon Judgment secured in the State Court Proceeding was not entitled to priority over the Class TT Settlement Agreement.  *Id.* at 9.

### B.     Procedural History

On August 31, 2018, defendants removed this action from the New York State Supreme Court in Manhattan, where Wimbledon had brought suit.  Dkt. 1.  On September 27, 2018, the Court stayed the case pending resolution of a motion before the Central District of California, in which defendants sought to enjoin this suit.  Dkt. 9.  On November 14, 2018, the Court lifted the stay following that court's ruling transferring the California action to this District.  Dkt. 11.  On December 14, 2018, defendants filed an answer to the complaint.  Dkt. 17.

On November 5, 2019, after fact discovery closed, the parties filed a joint statement of undisputed facts.  Dkt. 66.  Thereafter, between November 22, 2019, and January 27, 2020, the parties filed their respective summary judgment motions, oppositions, and supporting materials. On December 2, 2021, the Court held argument on the motions.

On August 2, 2022, the Court ruled on the parties' motions for summary judgment, granting defendants summary judgment as to the claims arising from the $2.412 million transfer and denying all parties summary judgment as to the claims arising from the $5 million transfer. *See* MSJ Opinion.  The Court found that Wimbledon was precluded from pursuing negligence claims based on the $2.412 million transfer, given that the New York State Supreme Court had already awarded a contempt fine based on the same wrong and Wimbledon had actually pursued

damages for negligence in that proceeding.  *Id.* at 23.  As to the negligence claims based on the $5 million transfer, however, the Court found neither party entitled to summary judgment.  *Id.* at 27.  The Court determined that defendants owed to Wimbledon a duty to refrain from participating in the disbursement of the $5 million upon their actual notice of the Restraining Notices, and that there was no factual dispute as to whether the disbursement breached that duty. *Id.* at 28–31.  The Court, however, found insufficient basis on which to grant summary judgment as to causation and damages.  *Id.* at 31.  The Court noted the unusual circumstances of Wimbledon's claim to the $5 million: at the time of the transfer, Wimbledon had only a monetary judgment against Bergstein, did not know of the Class TT Settlement Agreement, and had not taken additional steps, such as securing a turnover order, to secure its priority against Class TT and other creditors of Bergstein.  *Id.* at 33–34.  In light of the resulting uncertainty about whether—but for defendants' transfer of the $5 million to Class TT in violation of the Restraining Notices—Wimbledon, Class TT, or another creditor would have received the $5 million, the Court declined to resolve the causation element, which, it had noted, had been only thinly addressed in the parties' briefs.  *Id.* at 33–35, 35 n.6.

On October 26, 2022, after the parties proposed next steps, the Court set a briefing schedule for cross-motions for summary judgment as to the causation element of the negligence claims based on the $5 million transfer.  Dkt. 112.  Between November 16, 2022 and January 27, 2023, the parties filed their briefs and supporting materials.  Dkts. 115 ("Wimbledon MSJ"), 117 ("Defs. MSJ"), 118 ("Wimbledon Reply"), 119 ("Wimbledon Decl."), 120 ("Defs. Reply").

On February 1, 2023, Wimbledon moved to strike an argument as improperly raised for the first time in defendants' reply.  Dkt. 121.  That day, defendants opposed the motion.  Dkt. 122.  On February 2, 2023, Wimbledon responded, stating that the Court should strike

defendants' opposition for impermissibly enhancing arguments made for the first time on reply.
Dkt. 123.  On February 3, 2023, defendants responded by letter.  Dkt. 124.

On April 19, 2023, the Court held argument on the pending motions.  *See* Dkt. 130
("Tr.") (transcript of argument).[2]

## II.     Applicable Legal Standards

The Court may grant summary judgment only "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of proving the absence of a question
of material fact.  In making this determination, the Court must view all facts "in the light most
favorable" to the nonmoving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  If
the movant meets its burden, "the nonmoving party must come forward with admissible evidence
sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."
*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on
mere speculation or conjecture as to the true nature of the facts to overcome a motion for
summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation
marks omitted).  Rather, the non-moving party must establish a genuine issue of fact by "citing
to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v.
Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing
law" preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986).  In determining whether there are genuine issues of material fact, the Court is "required

---

[2] On May 31, 2023, pursuant to the parties' joint consent, the Court referred the case for
mediation before the Honorable Stewart D. Aaron, United States Magistrate Judge.  Dkt. 127.

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (internal quotation marks omitted).

## III.   Discussion

The sole issue on the current round of cross-motions for summary judgment is the causation element of Wimbledon's negligence and gross negligence claims based on defendants' participation in the unlawful transfer of $5 million to Class TT.  For the following reasons, the Court grants Wimbledon's motion for summary judgment as to causation, denies defendants' cross-motion on this point, and directs the parties to conduct limited further discovery regarding damages.  The Court denies as moot Wimbledon's motion to strike an argument raised in defendants' reply.

### A.   Motion for Summary Judgment

Under New York law, to prevail on a negligence claim, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825, 59 N.E.3d 485, 490 (2016) (quoting *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985)).  The causation element "incorporates at least two separate but related concepts: cause-in-fact and proximate cause.  Cause-in-fact refers to those antecedent events, acts or omissions, which have so far contributed to the result that without them it would not have occurred. . . .   Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct." *Aegis Ins. Servs. Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (citation omitted).  The "bedrock principle of tort law [is] that for there to be a recovery for an injury, it must be established that defendant's act was a cause-in-fact of an injury." *Id.* at 179.  A defendant's conduct is "not a

13

cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct." *Id.*

As the Court has already found, the undisputed facts establish that defendants had a duty not to assist their client, Bergstein, in violating the Restraining Notices upon their actual notice of them, and that defendants breached that duty by facilitating the disbursal of the $5 million to Class TT.[3] MSJ Opinion at 28–31. As to causation of injury, the parties set forth competing views of the showing required to sustain Wimbledon's negligence claims.

Wimbledon argues that it needs to prove only that (1) $5 million was available to satisfy its judgment at the time of the violation of the Restraining Notices; (2) defendants willfully facilitated the Restraining Notice violations and directly caused the loss of the $5 million; and (3) there is no evidence of another creditor or interest holder who had a superior interest in the funds at the time of the breach. Wimbledon MSJ at 8, 11–12; Wimbledon Reply at 4. In Wimbledon's view, the controlling cases on this question—including *Aspen Industries, Inc. v. Marine Midland Bank*, 52 N.Y.2d 575 (N.Y. 1981), and *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018)—require nothing further. *See* Wimbledon MSJ at 9–12. In particular, Wimbledon contends that it need not prove that, but for the violation of the Restraining Notices, it necessarily would have received the $5 million or otherwise perfected its interest in Bergstein's funds. *See, e.g., id.* at 12; Wimbledon Reply at 6, 11–12. Wimbledon

---

[3] Defendants renew their argument that Wimbledon did not establish Bergstein's interest in the $5 million transferred by Xanadu to Class TT. *See, e.g.*, Defs. MSJ at 2–3, 10–16 (arguing that Wimbledon had not proved that, *inter alia*, Xanadu's funds were restrained, Xanadu was an alter ego of Bergstein, or defendants exercised control over the $5 million). That argument was made and rejected earlier. Its renewal in the briefing of the causation element improperly relitigates the element of breach. The Court has found the documentary evidence to establish that defendants were aware of and involved in the $5 million transfer to Class TT and that the transfer thus violated the Restraining Notices, which extended to all property in which Bergstein had an interest. *See* MSJ Opinion at 13, 28–31.

argues that although it was a judgment creditor of Bergstein at the time of the breach, Class TT's right to the $5 million was solely contractual, and Class TT had a judgment against only SIP, such that its interest in Bergstein's funds was not superior to Wimbledon's.  Wimbledon MSJ at 12 n.7.

Defendants counter that, to fulfill its burden on the causation element, Wimbledon must prove not only that the $5 million was available at the time of the breach, but also that, but for the breach, it necessarily would have received the $5 million.  *See, e.g.*, Defs. MSJ at 13.  They argue that such might not have transpired, because, as of the transfer of the $5 million, and after, Wimbledon had not taken actions to establish its priority over other judgment creditors of Bergstein, including attempting to levy or execute against the Xanadu account or commencing supplemental enforcement proceedings through information subpoenas and deposition notices. *See id.* at 2, 10–11, 13–14.  And, they argue, Wimbledon has not excluded the possibility of ensuing factual developments that could have prevented Wimbledon from recovering the $5 million even had the Restraining Notices not been violated.  For example, they note, Bergstein could have filed for bankruptcy or Class TT could have converted its settlement into a judgment that took priority over Wimbledon.  *See, e.g.*, *id.* at 2–3, 17–18; Defs. Reply at 6–7.  Defendants separately assert that Wimbledon has not established that Xanadu *lacked* sufficient funds to satisfy Wimbledon's judgment against Bergstein, which, they contend, would have made the $5 million transfer harmless (or not a violation of the Restraining Notices).  Defs. MSJ at 16, 19. Finally, in their reply, defendants argue that Bergstein's conviction would have precluded Wimbledon from recovering the $5 million, insofar as the Government obtained a superior interest in Bergstein's funds through the ensuing restraining order and forfeiture order against Bergstein.  Defs. Reply at 2, 9–12.

On examination of the case law on the causation element, the Court finds Wimbledon's appraisal of the required showing to be the more persuasive.  To be sure, the case law does not delineate with crisp precision the distinct boundary between the causation and damages inquiries in the subset of negligence cases where a defendant's negligent violation of a restraining order is alleged to have denied a creditor funds to which it claimed an expectation.  The most apposite cases, however, indicate that the causation element in such contexts requires a showing only that the defendant's breach of its duty not to disburse the funds had the propensity to cause, and did in fact cause, some injury to the plaintiff, including by disabling it from drawing upon the restrained funds in real time.  Satisfying that element does not require a showing that, but for the breach, the plaintiff necessarily would have recovered all or even some of the restrained funds.  The case authority suggests that the issues on which defendants here focus—the plaintiff's priority relative to other creditors, or whether it would ultimately have proven entitled to some or all of the funds at issue—do not bear on the causation inquiry but instead belong in the ensuing assessment of damages.

Most instructive in this line is *CSX*.  The district court there had entered a $1.06 million judgment for plaintiff CSX Transportation, Inc. ("CSX") against Emjay Environmental Recycling, Ltd. ("Emjay"), based on breach of contract.  *See CSX*, 879 F.3d at 465.  CSX then served restraining notices upon three third-party entities (the "garnishees")[4] that had either purchased Emjay's assets or guaranteed payment and performance obligations in connection to those assets.  *See id.*  These notices, akin to those in the instant case, prohibited the garnishees

---

[4] A garnishee is "a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest."  N.Y. C.P.L.R. § 105(i).

from selling or otherwise transferring any debt owed by Emjay in order to facilitate CSX's

recovery of its judgment against Emjay. *See id.* About three months after CSX served the

restraining notices, the New York State Supreme Court approved a $2.2 million settlement in

unrelated actions involving Emjay, the garnishees, and other creditors of Emjay. *See id.* at 466.

CSX, which declined to participate in those settlement discussions, then moved for a turnover

order to compel the garnishees to satisfy its judgment against Emjay or, in the alternative, for

damages based on the garnishees' participation in the settlement in violation of the restraining

notices. *See id.* The district court held that CSX was entitled to $1.06 million in damages based

on the garnishees' negligent violation of the restraining notices, which resulted in the garnishees

no longer being able to satisfy CSX's judgment against Emjay.[5] *Id.* In doing so, the district

court recognized that the restraining notices did not grant priority to CSX. *See id.* at 467.

However, it found, only one creditor had a right superior to that of CSX, thus leaving the

garnishees with sufficient funds to satisfy CSX's judgment in full. *See id.*

On appeal, the Second Circuit upheld the district court's liability finding. *Id.* at 471. It

agreed with the district court that the garnishees had "negligently violated the Restraining

Notices" by transferring funds to entities other than CSX through the state court settlement.[6] *Id.*

The Circuit noted that (1) the restraining notices had prohibited transfer of any property in which

---

[5] In its original decision, the district court had also granted CSX's motion for a turnover order. *CSX*, 879 F.3d at 466. On reconsideration, however, the court clarified that its liability finding on the negligence claim relied on a damages (not a turnover) analysis. *Id.* at 467. The Second Circuit accordingly "confine[d] the scope of [its] review to the damages theory." *Id.*

[6] The Circuit also held that CSX was permitted to seek relief from the non-party garnishees under Federal Rule of Civil Procedure 69(a), rather than by special proceeding under New York law, *see CSX*, 879 F.3d at 468–70, and that C.P.L.R. § 5222(b) did not permit the garnishees' transfers to entities other than CSX, even though such transfers had been made pursuant to a state court order, *see id.* at 470–71.

Emjay had an interest, (2) the garnishees had been properly served with the restraining notices, and (3) Emjay had an interest in the $2.2 million that the garnishees paid on Emjay's behalf in the state court settlement. *See id.* at 471–72. "In such circumstances," the Court held, the garnishees "were not free to simply ignore the injunctive effect of the Restraining Notices" and "plainly violated the Restraining Notices in doing so." *Id.* at 472.

In its separate and more extensive analysis of damages—set out under the header "Damages"—the Circuit held that the district court had abused its discretion by failing to hold a hearing to resolve factual issues regarding the relative priorities of judgment creditors. This, the Circuit stated, was "a necessary predicate to determining the proper amount of damages, if any, sustained by CSX." *Id.* The Circuit noted that "[a] garnishee that violates a restraining notice may be liable to an aggrieved judgment creditor if the creditor establishes that 'it sustained damages as a result of the garnishee's disobedience of the [restraining] notice.'" *Id.* (quoting *Aspen*, 52 N.Y.2d at 581 (second alteration in original)). To establish such damages, the Circuit stated, the creditor must "demonstrate that property of the judgment debtor was available to satisfy the judgment at the time the restraining notice was in effect," *id.* (quoting *Aspen*, 52 N.Y.2d at 581), under New York's "comprehensive statutory scheme establishing priorities for directing the assets of a judgment debtor to competing judgment creditors," *id.* (citing C.P.L.R. § 5234). Because the "mere service of restraining notices . . . does not invoke standing in the ranking of priorities," the Circuit stated, "a judgment creditor must take additional steps—such as securing a turnover order or an execution levy—to prevent intervening parties from attaining higher priority." *Id.* at 472–73 (internal quotation marks omitted). As applied to CSX's pursuit of damages, the Circuit held, these principles dictated that "if other creditors had superior claims to the restrained funds before [the] [g]arnishees violated the Restraining Notices, then CSX did

not suffer damages." *Id.* at 473.  Because "the parties' submissions and the record demonstrate[d] a lack of clarity as to the order of priority of judgment creditors," the Court vacated the summary award of damages to CSX, and remanded with the instruction to the district court to conduct a hearing to determine the order of priority of Emjay's judgment creditors. *Id.* at 474.  The Court emphasized that, "[i]n general, a hearing is required to fix damages where it is unclear what amount in a garnishee's possession is the property of the judgment debtor and available to satisfy the judgment." *Id.* at 473.

The Second Circuit's analysis in *CSX* relied in part on *Aspen*, a New York Court of Appeals decision that is also instructive here.  There, a judgment creditor, Aspen Industries, Inc. ("Aspen"), sought damages from a bank for allegedly violating a restraining notice, pursuant to C.P.L.R. § 5222, that forbid disbursement of funds from the account of one of Aspen's judgment debtors. *See Aspen*, 52 N.Y.2d at 578.  The bank had exercised its right of setoff under New York's debtor and creditor law against the remaining balance of the judgment debtor's account, on the basis of the debtor's default of an obligation to the bank that predated service of Aspen's restraining notice. *See id.*  The Court of Appeals noted that, as a general matter, "violation of the restraining notice by the party served is punishable by contempt and subjects the garnishee to personal liability in a separate plenary action or a special proceeding under CPLR article 52." *Id.* at 580 (citation omitted).  The court determined, nevertheless, that Aspen was not entitled to such relief, because the bank had retained more than twice the amount of the judgment due, which was all that § 5222 required. *See id.* at 581.  The retention of such funds, the court held, rendered the restraining notice "not effective as to the remainder of the funds in the [] account," and meant that the bank "did not violate the notice served upon it by keeping the account open." *Id.* (internal quotation marks omitted).  Alternatively, the Court of Appeals held that, even if it

assumed that the bank violated the restraining notice, Aspen, as a judgment creditor, would be unable to "establish that it sustained damages as a result of the garnishee[ bank's] disobedience of the notice." *Id.*  Because the bank's right of setoff was "superior to the rights of intervening judgment creditors" and could be exercised "even after the judgment creditor has undertaken enforcement of his claim against the judgment debtor," the bank "at all times relevant had a superior right to offset the entire amount present in the [judgment debtor's] account, leaving no funds available to satisfy Aspen's judgment."  *Id.* at 582–83.  Accordingly, the court held, "no loss resulted to Aspen under the facts of this case."  *Id.* at 583.

Although *CSX* and *Aspen* are factually distinct from this case, taken together, they can be distilled to help illuminate the line between the causation and damages analyses in negligence cases based on restraining notice violations.[7]  These precedents teach that the *damages* inquiry encompasses questions such as the judgment creditor's priority relative to other creditors at the time of the violation of the restraining notice, as well as the judgment creditor's present-day entitlement to some or all of the funds at issue, including accounting for payments made to the creditor after the violation at issue.  *See CSX*, 879 F.3d at 472–74 (as to damages, considering whether other creditors had superior right to funds at time of restraining notice violation); *Aspen*, 52 N.Y.2d at 582–83 (where breach of restraining notice assumed, considering whether judgment creditor's right was "junior" to garnishee's right to funds such that "no loss" resulted from distribution of funds).  These cases also suggest that, although the amount of damages

---

[7] The Court has not found, and the parties have not cited, other federal or state court cases addressing questions of causation and damages in the restraining notice context or analogous settings.  Most restraining-notice cases instead concern questions not at issue here, including disputes as to the validity and scope of the restraint and/or whether the restraining notice was in fact violated.

ultimately imposed may take into account post-breach developments, the existence of damages, and the baseline for determining damages, is resolved based on the parties' positions at the moment of the breach.[8]

The antecedent *causation* inquiry, however, turns on a more straightforward question: whether, at the time of the breach, the defendant's disbursal of funds subject to the restraining notice had the propensity to cause, and did in fact cause, some injury to the plaintiff.[9]  *See CSX*, 879 F.3d at 471–72 (as to liability, considering whether garnishees were properly served with restraining notices and transferred funds in violation of restraining notice); *Aspen*, 52 N.Y.2d at 581 (as to liability, considering whether restrained account retained, after the allegedly violative distribution, sufficient funds per terms of restraining notice to satisfy obligations to judgment debtor); *cf., e.g.*, *Bravado Int'l Grp. Merch. Servs., Inc. v. U.S. Tennis Ass'n Inc.*, 179 A.D.3d 914, 916 (N.Y. App. Div. 2d Dep't 2020) (affirming lower court finding that entity negligently transferred funds in violation of restraining notice where "improperly transferred funds would have been sufficient to satisfy the balance of the petitioner's judgment and constituted property in which [judgment debtor] had an interest").

_____

[8] *See, e.g.*, *CSX*, 879 F.3d at 472 (judgment creditor may recover damages only if property was available to satisfy its judgment at the time that restraining notice in effect); *Aspen*, 52 N.Y.2d at 581–83 (judgment creditor had no damages where garnishee bank had superior setoff right to funds at "all times relevant"); *Doubet LLC v. Trs. of Columbia Univ.*, 99 A.D.3d 433, 434 (N.Y. App. Div. 1st Dep't 2012) (rejecting argument that judgment creditor suffered no damages where judgment debtor filed for bankruptcy after garnishee's violation of restraining notice, on ground that judgment creditor could have sought improperly transferred funds during period between restraining notice violation and judgment debtor's bankruptcy filing).

[9] The causation element is thus closely related to the breach element, and a finding of causation of injury will often follow from a finding of a breach.  But such will not always be so, as *Aspen* reveals, insofar as the Court of Appeals there found that even if a breach of a restraining notice were assumed, there was no consequent injury to the plaintiff.  *See Aegis*, 737 F.3d at 178 (both cause-in-fact and proximate cause required to prove causation).

This reading of the case law undermines defendants' central basis for opposing entry of summary judgment for plaintiff Wimbledon as to causation. Defendants would require the plaintiff, to establish causation, to prove that, but for defendants' breach, it necessarily would have recovered the full funds disbursed in violation of the restraining notice. That is wrong, and defendants, at argument, proved unable to cite case law in support of this theory. *See, e.g.*, Tr. at 62–63, 66–69. As a matter of policy, imposing such a burden would also be unwise, insofar as it would require a party like Wimbledon, which obtained and reasonably relied upon a valid restraining notice, and reasonably considered the funds of its debtor adversary Bergstein to be restrained, to disprove a range of hypothetical scenarios in order to recover. As *Aspen* and *CSX* instruct, it is sufficient for the plaintiff to adduce evidence establishing that the defendant's conduct actually and proximately caused the violation of the restraining notice, and that some injury inhered to the plaintiff as a result of the violation of the restraining notice.

A defendant, in turn, may create an issue of material fact on this element by adducing evidence that tends to disprove causation—for example, evidence that the restrained account retained sufficient funds to fully compensate the plaintiff, such that the plaintiff incurred no injury from the distribution of funds from the restrained account, or evidence that any injury to the plaintiff fell outside the range of foreseeable outcomes of the defendant's conduct. A defendant that produces undisputed evidence disproving causation would be entitled to summary judgment in its favor as to the causation element. *Cf. Aspen*, 52 N.Y.2d at 581 (finding no restraining notice violation, and thus no causation of injury, where restrained account retained at least twice the amount due to judgment creditor, such that "the restraining notice was 'not effective' as to the remainder of the funds in the . . . account" and the garnishee "did not violate the notice served upon it by keeping the account open"). If, however, there is evidence on which

a jury could find for either side as to whether defendant's conduct caused the restraining notice

violation and/or plaintiff incurred an injury, the question of causation would be left for the trier

of fact.  Such a finding will in most cases turn on the language and scope of the restraining notice

at hand, which may prohibit all or only certain kinds of transfers.

Applying these principles here, the evidence adduced easily establishes the causation

element.  As in *CSX*, it is undisputed that Wimbledon properly served restraining notices

forbidding the transfer of property in which Bergstein had an interest, defendants had notice of

the restraint, and defendants knowingly and willfully participated in the transfer to Class TT of

the $5 million in which Bergstein had an interest.  *See CSX*, 879 F.3d at 471–72.  Because

defendants "were not free to simply ignore the injunctive effect of the Restraining Notices," they

"plainly violated the Restraining Notices in doing so."  *Id.* at 472.  The plainly violative transfer

to Class TT, in turn, resulted in injury to Wimbledon, as it was then unable to recover the $5

million (or any portion of it) from Bergstein.

Defendants have failed to produce any evidence rebutting this clear showing of causation.

They have not, for example, demonstrated that, following the transfer to Class TT, Bergstein

retained sufficient funds to satisfy his obligations to Wimbledon such that the Class TT transfer

did not actually injure Wimbledon.[10]  Moreover, despite defendants' assertions about

Wimbledon's failure to further perfect its interest in Bergstein's funds, they have not

---

[10] The Court discerns no non-speculative basis on which to rule in favor of defendants because of
the possibility that Xanadu had sufficient funds to satisfy Wimbledon's judgment even after the
transfer to Class TT, *see* Defs. MSJ at 16, 19.  Defendants have not put forth any evidence that
Xanadu had such funds and in fact refused to engage with Wimbledon after it requested
information about the transfer to Class TT.  *See* Wimbledon 56.1 ¶¶ 32, 36–37.  Given
defendants' failure to engage productively with Wimbledon, the Court declines to penalize
Wimbledon for making the reasonable decision to pursue relief in state and federal court rather
than further investigate the availability of Bergstein's funds after the violative transfer.

demonstrated that Wimbledon's interest at the time of the breach was inferior, rather than identical or superior, to Class TT's interest so as to render the breach non-injurious. *See* Tr. at 36–38. And, importantly, defendants were unable to cite cases indicating that Wimbledon must prove on its *prima facie* case that its interest was superior to that of Class TT. *See id.* at 31–33, 39–40. Thus, even if the Court assumes that Wimbledon, through its state court judgment and restraining notices against Bergstein, and Class TT, through its settlement agreement with Bergstein, had identical claims to Bergstein's funds, this would not bear on the Court's ruling that the $5 million transfer to Class TT had the propensity to cause, and did in fact cause, injury to Wimbledon. Under the principles outlined above, absent a showing that Class TT undisputedly had a superior interest to Wimbledon, any question of Wimbledon's priority relative to other creditors is reserved for the damages inquiry.

For these reasons, Wimbledon has fulfilled its burden to prove the causation element of its claims. As with the assessment of duty and breach, the Court's analysis equally applies to Wimbledon's negligence and gross negligence claims. *See* MSJ Opinion at 36–37.

## B.     Motion to Strike

Wimbledon moves to strike, as improperly raised for the first time in defendants' reply, defendants' argument that the Government has a superior interest in the restrained funds pursuant to the September 2018 forfeiture order. Dkt. 121. Defendants oppose, contending that their argument as to the Government's interest responds to Wimbledon's "impermissibl[e]" enlargement of the record with additional documents, not produced in discovery, attempting to demonstrate Bergstein's interest in the $5 million, as well as to the Court's inquiry about whether Wimbledon would have received the $5 million absent defendants' breach. Dkt. 122. Wimbledon, in turn, moves to strike defendants' opposition as improperly enhancing arguments made for the first time in their reply and repeating statements known to be false. Dkt. 123.

24

Even assuming, *arguendo*, that defendants properly raised their argument about the Government's interest in Bergstein's funds,[11] the Court has no reason to consider it, as the causation question does not encompass inquiries as to the superiority of Wimbledon's interest in the $5 million or changes in its priority based on events after the breach.[12]   Accordingly, the Court denies as moot Wimbledon's motion to strike.   *See, e.g.*, *Holland v. Proj. Return Found.*, 198 F.3d 233, 233 (2d Cir. 1999) (denying as moot motion to strike where movant prevailed on other grounds); *LS Home Servs., Inc. v. Blackman Plumbing Supply Co., Inc.*, 582 F. App'x 43, 44 (2d Cir. 2014) (denying as moot motion to strike where motion resolved on other grounds); *Oberoi v. Bd. of Immigr. Appeals*, 237 F. App'x 698, 698 (2d Cir. 2007) (same).

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in Wimbledon's favor on the causation element of its claims based on defendants' participation in the transfer of $5 million to Class TT.   The Court denies as moot Wimbledon's motion to strike defendants' argument regarding the Government's interest in the restrained funds.

The Court directs the parties to file, within two weeks of the date of this opinion, an updated case management plan providing for limited discovery as to the damages stemming from the $5 million transfer.   Discovery is to be limited to intervening events since the close of fact discovery that implicate the scope of Wimbledon's damages, such as, *inter alia*, the receipt of

---

[11] Defendants have conceded that they made this assertion for the first time on reply.  Tr. at 62.

[12] Defendants' argument would likely fail on the merits, given that the $5 million transfer to Class TT took place in December 2017, *see* JSF ¶ 61, more than nine months before Bergstein's assets were subject to forfeiture, *see United States v. Bergstein*, No. 16 Cr. 746 (PKC), Dkt. 464. *See supra* note 8; *cf. Doubet LLC*, 99 A.D.3d at 434 (notwithstanding judgment debtor's eventual bankruptcy filing, judgment creditor suffered damages where it could have sought improperly transferred funds in months between violation of restraining notice and judgment debtor's bankruptcy filing).

sums that offset Wimbledon's outstanding recovery from Bergstein and any agreements reached between Wimbledon and Class TT.  *See CSX*, 879 F.3d at 473.  The Court will thereafter order summary judgment briefing on the factors to be considered in determining the damages owed to Wimbledon, including, for example, its interest in Bergstein's funds relative to that of his other creditors, the extent of its recovery from Bergstein at the time of the breach and to date, and its duty, if any, to mitigate its damages.  Such briefing should also address the Court's latitude, if any, to weigh equitable considerations in awarding damages.

The Clerk of Court is respectfully directed to close the motion pending at docket number 116.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 21, 2023
       New York, New York

26